Filed 7/21/25  Brewer v. Impact Biomedicines CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| JAMES BREWER,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>IMPACT BIOMEDICINES et al.,<br><br>    Defendants and Appellants. | D082594<br><br><br>(Super. Ct. No. 37-2019-00067876-CU-CO-CTL) |


APPEAL and cross-appeal from a judgment of the Superior Court of San Diego County, Richard S. Whitney, Judge.  Affirmed in part, reversed in part.

One, Peter R. Afrasiabi; Ellis George Cipollone O'Brien Annaguey, Ellis George, Christopher W. Arledge and Courtney L. Mitchell for Plaintiff and Appellant.

Latham & Watkins, Melissa Arbus Sherry, Colleen C. Smith, John T. Ryan, Andrew R. Gray and Christine C. Smith for Defendants and Appellants.

Dr. James Brewer, M.D., Ph.D. (Brewer), an expert in neurology, sued defendants Impact Biomedicines (Impact) and John Hood, Ph.D. (Hood) (together Defendants) for using his preliminary consulting work in submissions to the federal Food and Drug Administration (FDA) without his knowledge or consent. After a trial, the jury returned a special verdict in favor of Brewer on his causes of action for fraudulent concealment and quantum meruit. The jury awarded Brewer $1 million in compensatory damages against Defendants and $4 million in punitive damages against Hood on the fraudulent concealment cause of action and $20,000 in damages against Defendants on the quantum meruit cause of action.

After the trial court entered a judgment on the jury's verdict, Defendants filed motions for judgment notwithstanding the verdict (JNOV) and new trial, arguing, among other things, that there was insufficient evidence to support the jury's findings of liability and the amounts of damages it awarded. The trial court denied the motion for new trial and granted in part the JNOV motion, reducing the award of compensatory damages for fraudulent concealment to $100,000 and the award of punitive damages to $100,000. The court then entered a revised judgment reflecting those reduced amounts of damages. Brewer filed an appeal challenging that judgment and Defendants filed a cross-appeal.

On appeal, Brewer contends that the trial court erred: (1) by granting in part Defendants' JNOV motion and reducing the jury's awards of compensatory and punitive damages; (2) by instructing the jury on quantum meruit damages; and (3) by excluding certain evidence he offered in support of his quantum meruit cause of action. He also protectively argues that the trial court properly exercised its discretion in denying Defendants' motion for new trial.

In their cross-appeal, Defendants contend that: (1) the trial court erred by not granting in full their JNOV motion because there is insufficient evidence to support the jury's finding of liability on Brewer's fraudulent concealment cause of action; (2) the trial court erred by not alternatively granting their motion for new trial based on insufficiency of the evidence to support the jury's finding of liability and excessive damages; (3) if the jury's award of $1 million in compensatory damages on Brewer's fraudulent concealment cause of action is upheld, we should reduce its award of punitive damages against Hood to $1 million; and (4) if we reverse the judgment and direct that a new trial be held, we should conclude the trial court erred by admitting evidence on equity valuation in the original trial.

We conclude that substantial evidence supports the jury's findings on liability and damages, and the jury's award of punitive damages was not constitutionally excessive under the due process clause of the Fourteenth Amendment. The trial court erred by granting partial JNOV to reduce the amount of the compensatory and punitive damages. We find no legal basis to disturb the trial court's order denying a new trial on liability and damages. We also hold that the court erred in instructing on quantum meruit damages, but the error was not prejudicial. Accordingly, we reverse the revised judgment and the order granting partial JNOV and reinstate the original judgment on the jury's verdict.

FACTUAL AND PROCEDURAL BACKGROUND

TargeGen developed fedratinib, a drug to treat bone marrow cancer. Hood was TargeGen's director of research. Catriona Jamieson, M.D., a UCSD doctor, was one of three persons who discovered a mutation involving the JAK2 protein that causes bone marrow cancer. Jamieson was one of TargeGen's scientific advisors, was the senior principal investigator on its

3

multi-center phase I clinical trial, and had patients who took the drug during its clinical trials. After fedratinib successfully completed a phase I trial, TargeGen was sold to Sanofi, a large pharmaceutical company. Hood left TargeGen and started Wintherix, a new company.

In 2013, the FDA placed a clinical hold on Sanofi's clinical trials of fedratinib, citing concerns, among others, that the drug may have caused Wernicke's encephalopathy (WE) in eight patients. WE is caused by a thiamine deficiency and, if not timely treated, can result in severe neurological damage or even death.

In 2016, after Hood left Wintherix, he paid $250,000 to Sanofi and certain original TargeGen shareholders for an exclusive three-month option to purchase their rights to fedratinib for $5 million. During that three-month option period, Hood, Jamieson, and Raghu Saripalli formed Impact and found a large investor to support its purchase of Sanofi's rights to fedratinib and bring it to market. Hood was Impact's largest shareholder and its chief executive officer. Jamieson was a holder of about 5 percent of Impact's shares of stock and also its chief medical officer. Although Jamieson did not contribute any money or intellectual property to Impact to receive her shares of its stock, she contributed her medical and scientific knowledge, especially regarding myeloproliferative disorders caused by a mutation of the JAK2 gene.

In late May or early June 2017, Jamieson asked Brewer to look into the WE issue, which was one of the reasons for the FDA's hold on the clinical trials of fedratinib. Brewer was the chair of UCSD's department of neurology and a well-known expert in neurology and neuroradiology. Jamieson explained to Brewer that Impact needed his expertise on WE regarding its problems with the FDA. Brewer agreed to provide his brief feedback and

4

sent a June 9 email to Hood.  The email apparently attached "a brief summary of [his] impressions" on the case files of eight patients who had suffered possible WE symptoms during the clinical trials.  On June 13, Hood sent Brewer an email thanking him for agreeing to "put together a brief report" for them and offering to compensate him for his time.

On June 19, after Brewer provided Hood and Jamieson with his neurology assessments of the patients' case files, Hood sent Brewer an email thanking him for his brief report.  Brewer replied:  "I didn't want to tie it [i.e., compensation for his work] with my provision of the summaries (to avoid the appearance of bias toward a particular outcome), but for future consulting, if it is needed, let me know if there is an 'option' for non-employee stock options. I am optimistic that your company can do well, so let me know if you need my assistance when the time comes."  Hood answered:  "Definitely Jim.  There will be a scientific advisory role that will come up for which that will be appropriate."  On June 20, Brewer replied:  "Excellent.  Thanks, John. Happy to help!"

On July 19, Impact submitted an investigational new drug (IND) application to the FDA for fedratinib, along with a letter from Hood on behalf of Impact requesting that the FDA lift its hold on clinical trials of the drug. His letter attached a report, which included Brewer's neurology assessments, along with previous assessments by two other Impact consultants (Dr. Giulio Zuccoli and Dr. Julie Bykowski) and two Sanofi consultants, regarding the eight patients who suffered possible WE symptoms during the previous clinical trials.  Brewer was Impact's only neurologist, while the other two Impact consultants were neuroradiologists.  Impact represented to the FDA that the case narratives that it described in its application had been "interrogated by five independent experts in neurology and neuroradiology."

5

The report displayed a chart, which, among other things, summarized the assessments of the five consultants and, in so doing, represented that Brewer had assessed each of the eight patients' symptoms as either pathognomonic WE, likely WE, inconclusive, or not WE. Brewer's purported assessments were displayed first on that chart.

On July 24, Hood sent to Brewer and the other two consultants a draft abstract for an upcoming professional organization presentation. Brewer understood that he was being asked to approve the draft abstract because he was listed as its first author (i.e., its primary contributor). The draft abstract concluded that a retrospective analysis by its authors "suggest[ed] that fedratinib does not increase the risk . . . of [WE] in a large population beyond its potential to exacerbate malnutrition through manageable [gastrointestinal] adverse events." It further concluded that the data suggested that fedratinib does not inhibit thiamine absorption and any thiamine deficiencies could be managed by prescribing more vitamins. Brewer responded with "very minor edits" and did not dispute the draft abstract's findings and conclusions.

On August 17, Impact responded to an inquiry from the FDA regarding any concomitant use of fedratinib and thiamine by patients during the clinical trials and, in so doing, included a chart similar to the chart in its July 19 report that represented the assessments of the eight patients by Brewer and Drs. Zuccoli and Bykowski, but excluded the assessments by the two Sanofi consultants which had been included in the July 19 chart. Like the original chart, Brewer's purported assessments appeared first. Impact suggested to the FDA's representative that the chart "might be easier than you clawing through the data."

6

On August 18, the next day, the FDA sent a letter to Impact stating that it was removing its hold on clinical trials of fedratinib. The FDA stated: "We have completed the review of your submissions, and have concluded that you have provided the necessary documentation to remove the clinical hold. However, questions remain regarding the clinical adverse event findings documented in your trials and what further steps need to be taken to mitigate risk."

On November 1, per Impact's request, Brewer participated in a conference call among representatives of the FDA and Impact regarding, among other things, mitigation of the risk of WE. In preparation for the call, Brewer apparently reviewed Impact's slide presentation which included a table that incorporated the assessments of Brewer and the other two Impact consultants (but omitted the four labels Impact had previously used in the chart with its FDA application). During the call, Brewer simply introduced himself and did not otherwise participate.

On or about January 7, 2018, Celgene announced that it had entered into an agreement to acquire Impact, which would then become a wholly-owned subsidiary of Celgene. On January 8, Brewer emailed Hood and Jamieson congratulating them on the sale. On January 30, Brewer emailed Hood inquiring whether a scientific or clinical advisory role "remain[ed] in the cards under the new structure." Hood replied that he had some ideas for a central nervous system company for which Brewer would be perfect. Brewer replied, "Great."

During a February telephone call, Charlie McDermott, Impact's president, told Brewer that Hood felt awful about not being able to give him stock options to buy Impact stock and explained that the company was sold so quickly. That was the first time Brewer learned that he would not be

receiving stock options. McDermott suggested that Brewer instead ask Hood for philanthropy.

In March, Brewer contacted Hood to schedule a meeting regarding Hood's possible interest in making a $4 million donation to support an endowed chair for him at UCSD as an alternative means of compensation. Although Hood thereafter made a "handshake deal" with Brewer for such a donation, Hood did not ultimately make such a donation.

In June, a Celgene patent attorney contacted Brewer while determining who should be listed on a Celgene patent application related to fedratinib. After learning of Brewer's involvement with Impact and fedratinib, the patent attorney stated that Brewer should be named as an inventor on the patent application. When she asked what Brewer's agreement was with Impact, he replied that he had not signed over any of his inventor rights to Impact or Celgene. Thereafter, Celgene apparently filed two patent applications that included Brewer's name as an inventor. Celgene never paid Brewer for his review of its patent claims and applications. Instead, Celgene offered Brewer $8,000 to sign a consulting agreement with a retroactive effective date of June 13, 2017. In subsequent negotiations, Celgene offered Brewer $100,000. Brewer did not sign the proposed agreement.

In August 2019, the FDA approved fedratinib for sale and treatment.

In December 2019, Brewer filed the instant action, alleging causes of action against Impact, Hood, Celgene, and other defendants for: (1) quantum meruit; and (2) fraud and deceit. His quantum meruit claim sought compensation for the services he provided to Defendants, alleging that the fair value of his services was about $40,000 in stock options to purchase Impact stock at its value at the time he provided his services or,

8

alternatively, the current monetary value of those options had they been granted to him at that time. His fraud claim alleged that Defendants had made false promises to him and also fraudulently concealed information from him. He sought both compensatory and punitive damages.

A two-month jury trial was conducted during which the jury was presented with extensive testimony and documentary evidence. In closing, Brewer's counsel argued, among other things, that Defendants had fraudulently concealed that they were using Brewer's work product and name on Impact's submissions to the FDA.

On February 2, 2023, the jury returned a special verdict, finding Defendants liable to Brewer on his quantum meruit and fraudulent concealment claims and not liable on his false promise claim. It awarded Brewer $20,000 in quantum meruit damages and $1 million in compensatory damages for fraudulent concealment. The jury also found that Hood engaged in his fraudulent concealment conduct with malice, oppression, or fraud and awarded Brewer $4 million in punitive damages against Hood. On March 21, the trial court entered a judgment in favor of Brewer on the jury's special verdict and awarded him a total of $1,020,000 in compensatory damages against Defendants and $4 million in punitive damages against Hood.

Defendants thereafter filed motions for JNOV and a new trial. Brewer opposed the motions. On July 3, the trial court issued a minute order denying the motion for new trial and granting in part and denying in part the motion for JNOV. On the JNOV motion, the court found that there was sufficient evidence to support the jury's finding that Defendants were liable for fraudulent concealment, but reduced the jury's award of compensatory damages from $1 million to $100,000, which the court determined to be "a more realistic appraisal of [Brewer's] alleged fraud damages." The court also

9

reduced the jury's award of punitive damages against Hood from $4 million to $100,000, finding that the amount awarded by the jury was grossly excessive and that $100,000 "appear[ed] more in line with the evidence that was produced to support a fraud verdict." The court also upheld the jury's $20,000 award for quantum meruit damages.

On July 26, 2023, the court entered a revised judgment after trial, which awarded Brewer $20,000 in quantum meruit damages and $100,000 in compensatory damages for fraudulent concealment against Defendants and $100,000 in punitive damages against Hood. Brewer filed a notice of appeal and Defendants filed a notice of cross-appeal.[1]

## DISCUSSION

## I

### *Substantial Evidence to Support Fraudulent Concealment Liability and Jury's Compensatory Damages Award*

Brewer contends that the trial court erred by granting in part the JNOV motion filed by Defendants because: (1) a court cannot reweigh the evidence in deciding a JNOV motion; and (2) substantial evidence supports the jury's award of $1 million in compensatory damages for fraudulent concealment. Defendants, in turn, contend that the court erred by denying in part their JNOV motion because substantial evidence does not support the jury's verdict finding them liable for fraudulent concealment.[2] Alternatively,

---

[1] Because the parties' arguments in their appeal and cross-appeal are intertwined in many respects, we choose to address their arguments together on each major issue rather than separating our discussion of them into two separate parts in this opinion.

[2] Brewer filed a motion to partially dismiss Defendants' cross-appeal to the extent they challenge the trial court's order denying in part their JNOV motion. He argues that the appellate opening brief submitted by Defendants

they argue that the court correctly found the $1 million award of fraud damages to be excessive. They also contend that the court erred by denying their motion for new trial.

As discussed below, we conclude that the trial court procedurally erred by granting in part the JNOV motion and reducing the award of compensatory damages from $1 million to $100,000. We further conclude that substantial evidence supports the jury's finding of liability and its award to Brewer of $1 million in compensatory damages for fraudulent concealment. Finally, we conclude there is no legal basis to disturb the trial court's order denying a new trial on liability and damages.

A

*Background.* After the trial court entered its March 21, 2023 judgment, Defendants filed a motion for partial JNOV under Code of Civil Procedure section 629,[3] requesting that the trial court set aside the fraud liability and punitive damages portions of the judgment and instead enter a judgment finding them not liable for fraud and awarding no punitive damages to Brewer. They argued that substantial evidence did not support the jury's finding of fraud liability and award of punitive damages. In particular, they argued substantial evidence did not support the jury's underlying findings that: (1) they intentionally concealed from Brewer the fact that they used his name and work in Impact's submissions to the FDA with the intent to

---

failed to fairly summarize all of the evidence relevant to their contentions, including evidence favorable to him that supported the jury's verdict. We deny the motion because we conclude that any omissions were not sufficiently significant to warrant partial dismissal of the cross-appeal or a finding of waiver or forfeiture.

[3]     All statutory references are to the Code of Civil Procedure unless otherwise specified.

11

defraud him; (2) Brewer was unaware of their concealment of that fact; and (3) Brewer suffered actual harm because of their fraudulent concealment.

Brewer opposed the JNOV motion, arguing that the trial court could not reweigh the evidence or credibility of witnesses and that substantial evidence supported the jury's findings on each of the elements of his fraudulent concealment claim.

In its July 3, 2023 minute order, the trial court granted in part and denied in part the JNOV motion. After summarizing the parties' arguments in favor of, and in opposition to, the JNOV motion, the court stated:

> "It is the Court's opinion that while the evidence of concealment was 'very thin,' it nevertheless was presented to the Jury under four (4) different concealment theories and although the theories were weak and based solely on 'thin' circumstantial evidence, the Jury nonetheless found evidence of concealment and resulting fraud in rendering a $1,000,000 fraud verdict. [¶] . . . [¶] The Court agrees with [Brewer's] assertion that fraudulent concealment was based upon [his] reputation and misrepresentation made by [Defendants] to FDA as to alleged conclusions reached by [him]."

The court then concluded:

> "The Court does find a basis for reducing the $1,000,000 verdict/finding of fraud. The Court, while finding only minimal evidence of fraud by [Defendants], . . . believes sufficient evidence of various fraud concealment theories [was] presented to the Jury and an appropriate verdict was reached pursuant to the Court's direction as provided by proffered California Jury Instructions.
>
> "The Court agrees that the finding of fraud was not [*sic*] supported by substantial evidence of false promise or concealment. While the Jury did find evidence of fraud by concealment, the issue of damages was vague and difficult to attribute to [Defendants]. Because there was a significant lack of evidence by [Brewer] in support of fraud

12

> damages, the Court feels compelled to reduce the fraud verdict to $100,000. The $100,000 amount determined by the Court is a more realistic appraisal of [Brewer's] alleged fraud damages."

Accordingly, the court reduced the jury's award of compensatory damages for fraudulent concealment from $1 million to $100,000.

B

*Applicable law.* "[T]he elements of an action for fraud and deceit based on concealment are: (1) the defendant must have concealed or suppressed a material fact, (2) the defendant must have been under a duty to disclose the fact to the plaintiff, (3) the defendant must have intentionally concealed or suppressed the fact with the intent to defraud the plaintiff, (4) the plaintiff must have been unaware of the fact and would not have acted as he did if he had known of the concealed or suppressed fact, and (5) as a result of the concealment or suppression of the fact, the plaintiff must have sustained damage." (*Marketing West, Inc. v. Sanyo Fisher (USA) Corp.* (1992) 6 Cal.App.4th 603, 612-613 (*Marketing West*); see also, CACI No. 1901.) "In transactions which do not involve fiduciary or confidential relations, a cause of action for nondisclosure of material facts may arise in at least three instances: (1) the defendant makes representations but does not disclose facts which materially qualify the facts disclosed, or which render his disclosure likely to mislead; (2) the facts are known or accessible only to defendant, and defendant knows they are not known to or reasonably discoverable by the plaintiff; [and] (3) the defendant actively conceals discovery from the plaintiff." (*Warner Constr. Corp. v. City of Los Angeles* (1970) 2 Cal.3d 285, 294, fns. omitted.)

Section 629, subdivision (a) authorizes a trial court to grant a motion for JNOV "whenever a motion for a directed verdict for the aggrieved party

13

should have been granted had a previous motion been made." Under section 630, subdivision (b), a trial court shall grant a directed verdict "[i]f it appears that the evidence presented supports the granting of the motion as to some, but not all, of the issues involved in the action . . . ." Accordingly, "[t]he trial judge's power to grant a [JNOV] is identical to his power to grant a directed verdict. [Citations.] The trial judge cannot weigh the evidence [citation], or judge the credibility of witnesses. [Citation.] If the evidence is conflicting or if several reasonable inferences may be drawn, the motion for [JNOV] should be denied. [Citations.] 'A motion for [JNOV] may properly be granted only if it appears from the evidence, viewed in the light most favorable to the party securing the verdict, that there is no substantial evidence to support the verdict. If there is any substantial evidence, or reasonable inferences to be drawn therefrom, in support of the verdict, the motion should be denied.' [Citation.]" (*Hauter v. Zogarts* (1975) 14 Cal.3d 104, 110.)

On appeal, "[w]hen reviewing the validity of a [JNOV], an appellate court must resolve any conflict in the evidence and draw all reasonable inferences therefrom in favor of the jury's verdict. [Citation.]" (*Czubinsky v. Doctors Hospital* (1983) 139 Cal.App.3d 361, 364.) In so doing, the appellate court "determine[s] de novo whether there is substantial evidence to support the verdict and whether the moving party is entitled to judgment in its favor as a matter of law." (*Paykar Construction, Inc. v. Spilat Construction Corp.* (2001) 92 Cal.App.4th 488, 494.) Substantial evidence is not "any" evidence, but evidence that is reasonable, credible, and of solid value. (*Kuhn v. Department of General Services* (1994) 22 Cal.App.4th 1627, 1633.) The testimony of a single credible witness, including that of a party to the action, may constitute substantial evidence provided that testimony is not inherently

improbable or implausible. (*In re Marriage of Mix* (1975) 14 Cal.3d 604, 614; *Bloxham v. Saldinger* (2014) 228 Cal.App.4th 729, 750.) In determining whether there is substantial evidence to support a verdict, "the appellate court's power begins and ends with a determination of whether there is any substantial evidence—contradicted or uncontradicted—to support the [jury's] findings." (*Schmidt v. Superior Court* (2020) 44 Cal.App.5th 570, 582 (*Schmidt*).) In so doing, the appellate court cannot reweigh the evidence. (*Id.* at p. 581.)

With one exception, which we discuss below, a trial court cannot grant in part a JNOV motion to reduce an award of damages. In *Teitel v. First Los Angeles Bank* (1991) 231 Cal.App.3d 1593 (*Teitel*), the trial court granted the defendant's JNOV motion and reduced the jury's award of $500,000 punitive damages to $50,000, but denied the defendant's motion for new trial. (*Id.* at p. 1596.) On appeal, *Teitel* concluded that the trial court erred in granting the JNOV motion. (*Ibid.*) Because, as the trial court found, there was substantial evidence to support an award of punitive damages in some amount, it erred by using the JNOV procedure to reduce the amount of the damages awarded by the jury. (*Id.* at pp. 1603-1604.) *Teitel* stated: "The Legislature has provided an exclusive remedy for a trial court to employ where some damages are properly awarded, but the amount is excessive. That is through a remittitur pursuant to . . . section 662.5. " (*Id.* at pp. 1604-1605, fn. omitted.)

*Teitel* noted that a party may use two statutory procedures to obtain a judgment contrary to a jury's verdict: (1) a motion for new trial pursuant to section 657; and (2) a motion for JNOV pursuant to section 629. (*Teitel, supra*, 231 Cal.App.3d at p. 1602.) Section 657, subdivision 5, authorizes a trial court to grant a new trial on the ground of excessive damages. (*Teitel*, at

15

p. 1602.) Pursuant to section 662.5, a trial court may deny a section 657 motion for new trial conditioned on the plaintiff's consent to a reduction to an amount of damages that the court in its independent judgment determines to be fair and reasonable. (§ 662.5, subd. (a).) Section 662.5, subdivision (a) provides in relevant part: "In any civil action where after trial by jury an order granting a new trial limited to the issue of damages would be proper, the trial court may in its discretion: [¶] . . . [¶] (2) If the ground for granting a new trial is excessive damages, issue a conditional order granting the new trial unless the party in whose favor the verdict has been rendered consents to the reduction of so much thereof as the court in its independent judgment determines from the evidence to be fair and reasonable." *Teitel* concluded that the trial court erred by reducing the jury's award of punitive damages by granting the JNOV motion, instead of issuing an order pursuant to sections 657 and 662.5 granting a new trial conditioned on denial of a new trial if the plaintiff consented to a remittitur (i.e., a reduced amount of punitive damages). (*Teitel*, at pp. 1596, 1602.) Furthermore, *Teitel* noted that a trial court granting, or conditionally granting, a new trial motion is required to specify the grounds on which it is granted and the reasons supporting its decision. (*Id.* at p. 1605.) Accordingly, *Teitel* reversed the order granting the JNOV motion, reinstated the original judgment on the jury's verdict, and remanded the matter with directions to reconsider the defendant's motion for a new trial on the issue of punitive damages subject to the condition that the motion be denied in the event the plaintiff consented to a remittitur of damages as the trial court determined. (*Id.* at pp. 1606-1607.)

In *ENA North Beach, Inc. v. 524 Union Street* (2019) 43 Cal.App.5th 195 (*ENA North Beach*), the trial court made the same error as the *Teitel* trial court did (i.e., it granted a JNOV motion and reduced the $916,925

amount of punitive damages awarded by the jury to $131,500). (*Id.* at p. 209.) Citing *Teitel*, *ENA North Beach* stated: "Where the evidence supports a plaintiff's entitlement to punitive damages but the amount of the award is challenged as unreasonably high, the court cannot reduce the amount of damages on a motion for JNOV." (*Id.* at p. 210.) The court stated: "The procedural mechanism by which a trial court may reduce an award of damages it deems properly awarded but excessive in amount is through a remittitur pursuant to section 662.5." (*Id.* at p. 212.) *ENA North Beach* stated: "Generally, the remedy for the [trial] court's error in granting the motion for JNOV in order to reduce the punitive damages award against [a defendant] would be for [the appellate court] to *reverse* [the trial court's] order *and reinstate the original judgment on the jury's verdict*." (*Id.* at p. 213, italics added.)

Nevertheless, *ENA North Beach* recognized that "[o]ne exception to the exclusivity of this remedy may exist where the trial court concludes the evidence supports an award of punitive damages but finds the amount awarded exceeds constitutional bounds [citations] and reduces that amount to the constitutional maximum." (*ENA North Beach, supra*, 43 Cal.App.5th at p. 212.) The trial court in *ENA North Beach* did not appear to make any determination of the constitutional maximum for punitive damages in the circumstances of its case. (*Ibid.*) However, the appellate court concluded that it could not reinstate the jury's amount because substantial evidence did not support that amount of punitive damages. (*Id.* at pp. 213-215.) The court instead chose to accept the plaintiff's concession that the trial court's reduced amount of $131,500 in punitive damages was fair and reasonable and affirmed the judgment on that ground. (*Id.* at pp. 209, 215.)

17

## C

*Trial court's JNOV error and jury's liability finding.* The parties agree that the trial court here erred by granting in part the motion for JNOV and reducing the jury's award of $1 million in compensatory damages for fraudulent concealment to $100,000. We also agree that *Teitel* and *ENA North Beach* are controlling authority and precluded the trial court from granting in part the JNOV motion to reduce the $1 million amount of compensatory damages awarded by the jury. (See *Teitel, supra,* 231 Cal.App.3d at pp. 1596, 1603-1605; *ENA North Beach, supra,* 43 Cal.App.5th at pp. 210-212.)

The parties, however, disagree as to the proper remedy for the trial court's error. Brewer argues that we should reverse the order granting in part the JNOV motion and reducing the compensatory damages to $100,000 and simply reinstate the original $1 million amount awarded by the jury. Defendants disagree with Brewer and instead argue that we should: (1) reverse the jury's finding of their liability for fraudulent concealment because substantial evidence does not support that finding and therefore the trial court should have granted their JNOV motion in full; or (2) if we do not so rule, reverse the order granting in part their JNOV motion and remand the matter with directions that the trial court allow Brewer to accept either a remittitur of compensatory damages to $100,000 or a new trial on compensatory damages.

We first address the question of whether substantial evidence supports the jury's finding that Defendants were *liable* for fraudulent concealment. As the trial court instructed the jury with CACI No. 1901, Brewer was required to prove five elements to prevail on his fraudulent concealment cause of

action.[4] (See also, *Marketing West, supra*, 6 Cal.App.4th at pp. 612-613.) First, Brewer was required to prove that Defendants intentionally failed to disclose certain facts that were known only to them and that Brewer could not have discovered. (CACI No. 1901.) At trial, Brewer presented evidence showing that Defendants did not disclose certain facts known only to them and which Brewer could not have discovered. In particular, in response to the requests of Jamieson and Hood, Brewer provided Defendants with his "initial thoughts" email, which was a brief summary of his impressions on the case files of eight patients who had suffered possible WE symptoms during the clinical trials. Brewer testified he called that brief summary his "initial thoughts," rather than a report, to ensure that Hood knew they were not his final assessments. He later sent them a brief, but more detailed, report on his neurology assessments of those patients.

Brewer testified that his initial assessments of those patients were intended to give Hood "a taste of which way [he was] leaning" or "where we were at that point." His assessment of one patient was only "partial" because he was awaiting more complete data (i.e., source documents from the Mayo Clinic) regarding that patient. His initial impressions were not on his letterhead or signed because they were "not complete." They were not a formal document. Brewer testified that thereafter he never saw the

---

4   The trial court instructed with CACI No. 1901, as follows: "[Brewer] claims that he was harmed because [Defendants] concealed certain information. To establish this claim, [Brewer] must prove all of the following: [¶] 1. That [Impact] and/or [Hood] intentionally failed to disclose certain facts that were known only to them and that [Brewer] could not have discovered; [¶] 2. That [Impact] and/or [Hood] intended to deceive [Brewer] by concealing the fact[s]; [¶] 3. That had the omitted information been disclosed, [Brewer] reasonably would have behaved differently; [¶] 4. That [Brewer] was harmed; and [¶] 5. That [Impact] and/or [Hood's] concealment was a substantial factor in causing [Brewer's] harm."

additional Mayo Clinic source documents for the one patient.[5]  In fact, Hood admitted at trial that neither Brewer nor either of the other two consultants saw the case narratives that Impact submitted to the FDA with its application.

Without informing Brewer and without his knowledge, Defendants incorporated his initial assessments of those patients into a chart, which Impact included in the FDA application for fedratinib that it submitted to the FDA on July 19, 2017.  Hood admitted at trial that he had no documentary evidence showing that he or Impact disclosed to Brewer that they intended to send his initial assessments to the FDA.  Furthermore, Brewer testified that he never saw or "signed off" on the report or chart that Impact submitted to the FDA.  That chart represented that Brewer had assessed each of the eight patients' symptoms as either pathognomonic WE, likely WE, inconclusive, or not WE and they were designated, respectively, with the letters "P," "L," "I," and "N."  In fact, in his training and clinical experience in diagnosing patients, Brewer never used those labels.  Brewer testified that he did not, and no one at Impact asked him to, label each of the eight patients with those labels.[6]

Brewer testified that he, in fact, disagreed with Impact's chart showing that he had concluded the first patient had pathognomonic WE.  That label was, in fact, incorrect.  He also disagreed with the chart's representation that he had concluded the fourth patient was inconclusive.  He also was not

---

[5]    Hood also admitted at trial that Brewer did not see the additional information regarding the Mayo Clinic patient that Impact received after Brewer gave them his June 2017 initial assessments of the eight patients.

[6]    Jamieson also testified that Brewer's June 2017 assessments of the eight patients did not use that terminology or labels.

20

informed that Impact was going to include his resume with its FDA application. Also, unbeknownst to Brewer, Impact included his June 2017 "initial impressions" email, but altered the heading of that email to "Review of Possible WE Cases by Dr. James Brewer, Acting Director, Department of Neurosciences UCSD," which language Brewer had not drafted. Brewer also testified that he did *not* agree with Impact's statement that "[f]edratinib does not interfere with thiamine transport," because he does not actually know the answer to that question. He testified that if he had been asked to sign off on that statement, the question would have required further discussion. Similarly, he would have required further discussion regarding Impact's statement that: "The risk of WE and treatment with fedratinib for MF, is not higher than what would be expected in this patient population." Brewer testified that he would have never allowed his reputation to be used in July 2017 to argue to the FDA that fedratinib does not cause WE. He would have required further information and discussion before doing so.

Brewer also testified that he expected after he gave Impact and Hood his initial assessments that Impact would offer him a formal consulting agreement, pursuant to which he would complete his assessments and, in turn, receive compensation from Impact equivalent to what other companies had given him (i.e., stock options for about 1 percent to 2 percent of the company's stock). In particular, when Brewer sent Hood his "CV" (i.e., resume) per Hood's request, Brewer thought it was required for Impact's board to grant him stock options as had been his experience with other companies.[7] Brewer testified that although he believed he had been promised stock options in July 2017, Impact never offered him a stock option

---

[7] Brewer further testified that neither Hood nor anyone else at Impact informed him that Impact was going to submit his CV to the FDA.

agreement.  Furthermore, the patent attorney for Impact and Celgene (Impact's successor) testified that because "[i]t is almost universal that consultants would have a consulting agreement," she was "surprised" to learn in 2019 that Impact did not have one for Brewer's consulting work for it and therefore ownership of his work had not been transferred to Impact or Celgene.

Based on the above evidence, we conclude that the jury could reasonably find that Defendants intentionally failed to disclose certain facts known only to them and that Brewer could not have discovered those undisclosed facts.  As Brewer argues, the jury could reasonably find that Defendants failed to inform him that they planned to include, and then included, his initial assessments and resume with Impact's FDA application; they failed to disclose that Impact represented to the FDA that Brewer's initial June 2017 assessments were his final assessments; they did not inform Brewer about the labeling on the chart or Impact's representation that Brewer had assessed and so classified the patients' symptoms; they did not disclose that they used Brewer's work to communicate to the FDA conclusions he had not in fact reached; and they did not disclose that they intended to use Brewer's assessments and resume in support of the FDA application without offering him a consulting agreement and/or stock option agreement.

The evidence also supports the jury's finding that Defendants *intentionally* failed to disclose these facts to Brewer.  In particular, based on evidence showing that Defendants did not ask Brewer to review Impact's FDA application before it submitted its application, including its misrepresentations regarding his purported assessments of the eight patients and labeling of those patients in its chart, the jury could reasonably infer

22

they intentionally, rather than negligently or accidentally, failed to disclose those facts to Brewer. Also, the evidence discussed above shows that Defendants prepared the application that Impact submitted to the FDA and did so without Brewer's knowledge or review. In fact, Brewer testified that he did not learn about those undisclosed facts until discovery was conducted in the instant action. Therefore, the jury could further find that Defendants were in control of the representations and charts included in Impact's FDA application and that Brewer could not have discovered their intentional failure to disclose those facts to him. Accordingly, we conclude that substantial evidence supports the jury's finding that Brewer met his burden to prove the first element of his fraudulent concealment cause of action.

Second, Brewer was required to prove that Defendants intended to deceive Brewer by concealing the above facts. (CACI No. 1901.) In determining whether Defendants had the intent to deceive Brewer, the jury could reasonably rely on circumstantial evidence and reasonable inferences from that evidence. "As direct proof of fraudulent intent is often an impossibility, fraud may be established by the circumstances surrounding the transaction. [Citation.] Fraud is not generally practiced in the open light of day and for that reason is not susceptible of direct proof but must be spelled out from circumstantial evidence." (*Wilke v. Coinway, Inc.* (1967) 257 Cal.App.2d 126, 138.) Given the record in this case, we conclude there is substantial evidence to support the jury's finding that Defendants *intended to deceive* Brewer when they concealed from him the facts discussed above. In particular, the jury could reasonably infer that when Defendants used Brewer's name and initial assessments in Impact's FDA application and misrepresented his assessments as final with the four labels used in its chart, they did so intentionally and failed to disclose those facts to Brewer with the

23

intent to deceive him. Furthermore, the fact that, as the patent attorney for Impact and Celgene testified, consultants almost universally have consulting agreements could support a reasonable inference by the jury that the failure of Defendants to offer a consulting agreement to Brewer shows that they had the intent to deceive him by using his name and work without compensating him and/or properly obtaining the rights to his work. Therefore, substantial evidence supports the jury's finding on the second element that Impact and Hood intended to deceive Brewer by intentionally failing to disclose the above facts.

Third, Brewer was required to prove that had the omitted information been disclosed to him, he reasonably would have behaved differently. (CACI No. 1901.) Based on the evidence discussed above, there is substantial evidence supporting the jury's finding that Brewer reasonably would have behaved differently had Impact and Hood disclosed to him the omitted information. In particular, the jury could reasonably infer that had Defendants disclosed to Brewer the above information, he would have taken further action to ensure his assessments were complete (e.g., by obtaining and reviewing further data from the Mayo Clinic patient) and correct the inaccuracies and/or mislabeling included in Impact's chart and its conclusion that fedratinib did not cause WE. At a minimum, he would have required further information and discussion before supporting that conclusion. In addition, the jury could reasonably infer that Brewer would have required Impact to provide him with a consulting agreement, including a grant of stock options for Impact stock, for that additional work and use of his name and work in support of Impact's FDA application. Therefore, substantial evidence supports the jury's finding that had Defendants disclosed to Brewer

24

the omitted information, Brewer reasonably would have behaved differently. (CACI No. 1901.)

Fourth, Brewer was required to prove that he was harmed. (CACI No. 1901.) Brewer testified that he expected after he gave Impact and Hood his initial assessments that Impact would offer him a formal consulting agreement for the completion of his assessments and other services and would receive Impact stock options for his consulting services. Brewer also testified that although he believed he had been promised stock options in July 2017, Impact never offered him a stock option agreement. The patent attorney for Impact and Celgene also testified that because "[i]t is almost universal that consultants would have a consulting agreement," she was "surprised" to learn that Impact did not have one for Brewer's consulting work and therefore ownership of his work had not been transferred to Impact or Celgene. Accordingly, the jury could reasonably infer that Brewer was harmed by the failure of Defendants to disclose the omitted information and, in particular, that Impact was not going to offer him a consulting agreement and Impact stock options for his consulting services and instead proceeded to use his work in support of its FDA application without any compensation. Therefore, substantial evidence supports the jury's finding on the fourth element that Brewer was harmed.[8]

Fifth, Brewer was required to prove that the concealment of that information by Defendants was a substantial factor in causing Brewer's harm. (CACI No. 1901.) As we concluded above, the jury could reasonably infer that Brewer was harmed by the failure of Defendants to disclose the omitted information and, in particular, that Impact was not going to offer

---

[8] We separately discuss below whether substantial evidence supports the jury's award of $1 million in compensatory damages on Brewer's fraudulent concealment cause of action.

him a consulting agreement and Impact stock options for his consulting services and instead proceeded to use his work in support of its FDA application without any compensation. Based on that conclusion and the evidence at trial, the jury could further reasonably infer that had Defendants not concealed that information from Brewer, he would not have suffered the harm discussed above. In particular, the jury could reasonably infer that had they not concealed the information from Brewer, Impact would have offered him a consulting agreement and Impact stock options for his services. Therefore, the jury could reasonably find that the concealment by Defendants was a substantial factor in causing that harm to Brewer. Accordingly, substantial evidence supports the jury's finding on the fifth element of Brewer's fraudulent concealment cause of action.

In sum, we conclude there is substantial evidence to support the jury's finding that Brewer proved all five elements of his fraudulent concealment cause of action. Although Defendants extensively cite evidence, and inferences therefrom, that would have supported a contrary finding by the jury, they do not, in so doing, carry their burden on appeal to show substantial evidence does not support the jury's finding on their liability. Accordingly, the trial court committed no error by denying Defendants' JNOV motion as to the jury's finding of liability for fraudulent concealment.

D

*Trial court's JNOV error as to the jury's award of compensatory damages.* As we have discussed, the trial court lacked authority to reduce the jury's compensatory damages award by granting a partial JNOV. To resolve the parties' dispute over the appropriate remedy, however, we must first determine whether substantial evidence supports the jury's award of

26

$1 million in compensatory damages for fraudulent concealment. As we explain, we conclude that it does.

1. *Evidence.* At trial, Brewer testified that at the time he provided consulting services to Defendants in 2017, he had required other companies to give him stock options, and not hourly wages or other money, as compensation for his consulting services. In particular, Brewer testified that he had previously required stock options for about 1 percent to 2 percent of the stock of those companies to which he had provided consulting services. As examples, he cited stock options he had received from Human Longevity, Inc., CorTechs Laboratories, Molecular Image, and Enkefalos Biosciences, LLC for his consulting services.

Exhibit 2021 was admitted in evidence, showing that in October 2016 CorTechs Laboratories had granted Brewer stock options for 25,000 shares of the company's stock, or about 1 percent of the company's stock as he testified. Brewer testified that CorTechs Laboratories had granted him many other stock options, which added up to 300,000 shares and currently amounted to about 2 to 3 percent of the company's stock. Exhibit 51 was admitted in evidence, showing that in March 2005 Molecular Image had granted Brewer stock options for 100,000 shares of the company's stock, which, as he testified, represented 1 percent of the company's stock.[9] Exhibit 2136 was admitted in evidence, showing that in May 2021 Enkefalos Biosciences had granted Brewer stock options for 1,000 shares, which, as he testified, represented 1 percent of the company's stock at that time. Exhibit 52 was admitted in evidence, showing that in May 2014 Human Longevity, Inc. had granted Brewer stock options for shares of the company's stock, which, as he

---

[9]    Exhibit 51 also showed that Molecular Image granted Brewer additional stock options for 50,000 shares in March 2007 and 875,000 shares in May 2007.

27

testified, were worth about $30,000 at the time of their grant. Brewer testified that in July 2017 he had an understanding that Impact would give him a typical consulting stock option agreement, which would grant him stock options for about 1 to 2 percent of Impact's stock.

Defendants presented expert testimony by Ioannis Gkatzimas on the valuation of stock options damages if the jury found those damages were an appropriate remedy. He testified that the exercise price for a stock option grant must be the fair market value of the shares at the time of the grant. On September 12, 2017, Impact conducted a "409A" valuation of its shares of stock and valued its shares at $0.71 per share. On December 20, 2017, Celgene made a definitive proposal to acquire shares of Impact stock with a valuation of $12.90 per share. Gkatzimas opined that based on the September 12, 2017 valuation, assuming Brewer had received $40,000 worth of stock options from Impact as he had testified he commonly received, Brewer would have received stock options for 62,221 shares of Impact's stock. He testified that those 62,221 shares of Impact's stock would then have a value of $1,375,000 as of the time of the trial. In contrast, if the stock options had been based on the December 20, 2017 share valuation, Brewer would have received stock options for only 3,417 shares, which would then have a value of only $33,856 as of the time of trial.

Gkatzimas further opined that, assuming Brewer had received only $30,000 worth of stock options, Brewer would have received stock options for 46,666 shares of Impact's stock based on the September 12, 2017 valuation. He testified that those 46,666 shares of Impact's stock would then have a value of $1,031,388 as of the time of the trial. In contrast, if the stock options had been based on the December 20, 2017 share valuation, he would have

28

received stock options for only 2,563 shares, which would then have a value of about $35,392 (presumably, he meant $25,392) as of the time of trial.

Jamieson testified that she was one of the founders of Impact and had worked about 100 hours for it. She had a critical role in discovering a molecule that led to the development of fedratinib. In 2016, she was given shares of Impact's common stock, which represented about 5.1 percent of its outstanding shares at the time Celgene acquired Impact. She received about $85 million for her Impact shares.

2. *Jury instructions and verdict.* The trial court instructed the jury with CACI No. 1923 on determining the amount of compensatory damages for fraudulent concealment, as follows:

> "[Y]ou also must decide how much money will reasonably compensate [Brewer] for the harm. This compensation is called 'damages.'
>
> "The amount of damages must include an award for all harm that [Defendants] were substantial factors in causing, even if the particular harm could not have been anticipated.
>
> "[Brewer] must prove the amount of his damages. However, [Brewer] does not have to prove the exact amount of damages that will provide reasonable compensation for the harm. You must not speculate or guess in awarding damages.
>
> "To decide the amount of damages you must determine the fair market value of what [Brewer] gave and subtract from that amount the fair market value of what he received.
>
> " 'Fair market value' is the highest price that a willing buyer would have paid on the date of the transaction to a willing seller, assuming: [¶] 1. That there is no pressure on either one to buy or sell; and [¶] 2. That the buyer and

29

> seller know all the uses and purposes for which the services are reasonably capable of being used.

> "The fair market value is measured as of the date the promise was breached."

The trial court did not instruct the jury on the "benefit of the bargain" method of calculating fraud damages, which applies to certain types of intentional *misrepresentation* cases and allows the plaintiff to recover the fair market value of what the plaintiff would have received if the representations made by the defendant had been true. (CACI No. 1924.)

The jury, having been so instructed, returned a verdict determining Brewer's compensatory damages for his fraudulent concealment claim against Impact and Hood to be $1 million.

      3. *Analysis*. Based on the evidence discussed above, substantial evidence supports the jury's award of $1 million in compensatory damages to Brewer on his fraudulent concealment cause of action applying CACI No. 1923. First, as we have summarized, Brewer presented evidence that in and before 2017 he required, and received, stock options from the companies for which he performed consulting services in the amount of about 1 percent or 2 percent of the stock of those companies. Substantial evidence supports a finding by the jury that had Impact and Hood not fraudulently concealed the information, he would have required, and Impact would have granted him, stock options worth about $30,000 at the time of grant, or about 1 percent of Impact's stock, for his consulting services. Therefore, applying CACI No. 1923, the jury could find that the reasonable compensation for the harm caused to Brewer by that fraudulent concealment should be the value of the stock options for Impact stock that he presumably would have received for his consulting services but for Impact's fraudulent concealment (i.e., $30,000

30

worth of stock options at the time of their grant or 1 percent of Impact's stock).

We further conclude that substantial evidence supports an additional finding by the jury that the fraudulent concealment by Defendants primarily occurred in June and July 2017 when Brewer gave Impact his initial assessments of the eight patients and Impact used his name and assessments in its July 2017 FDA application for fedratinib and continued to do so thereafter. Based on that timeframe, the jury, applying CACI No. 1923, could reasonably find that reasonable compensation for the harm they caused Brewer should be calculated or measured as of that time (i.e., June and July 2017). Applying CACI No. 1923, the jury could therefore reasonably find that reasonable compensation should be the fair market value of the stock options Brewer would have received for his consulting services had Defendants not fraudulently concealed information from him in June and July 2017 and thereafter. Importantly, Gkatzimas, the expert witness for Defendants, opined, among other things, that the value of $30,000 worth of Impact stock options granted on September 12, 2017 (which was the earliest date after June and July 2017 of a "409A" valuation of Impact's stock) was $1,031,388 as of the time of trial and the value of $40,000 worth of Impact stock options granted on September 12, 2017 (which was the earliest date after June and July 2017 of a "409A" valuation of Impact's stock) was $1,375,000 as of the time of trial. Accordingly, substantial evidence supports the jury's finding that $1 million was the fair market value of, or reasonable compensation for, the harm Defendants caused Brewer by their fraudulent concealment. Although there was evidence that could have supported a greater amount (e.g., $1,375,000 or $1,031,388), the jury properly applied CACI No. 1923 in

31

awarding him an amount of compensatory damages slightly less than what the evidence could have supported.

This valuation of Brewer's consulting services was not speculative because it was based on admitted evidence of what he charged other companies, and the valuation was done by Defendants' own expert based on Impact's ascertainable stock price at the time of the fraudulent concealment and its current value.[10] This evidence provided a reasonable basis for the jury to calculate Brewer's fraud damages with reasonable certainty under CACI No. 1923. Nothing in CACI No. 1923 precluded the jury from using this method for determining the value of Brewer's services and his compensatory damages for the fraudulent concealment. Absent any claim of instructional error, we must evaluate the sufficiency of evidence "under the law stated in the instructions given, rather than under some other law on which the jury was not instructed." (*Bullock v. Philip Morris USA, Inc.* (2008) 159 Cal.App.4th 655, 674-675.) Therefore, the trial court erred by finding that substantial evidence did not support the $1 million amount in compensatory damages that the jury awarded Brewer on his fraudulent concealment cause of action under CACI No. 1923.

To the extent Defendants cite other evidence and inferences that would have supported a lesser award of compensatory damages, they misconstrue the substantial evidence standard that we apply in reviewing the jury's

---

[10]   Defendants have not argued on appeal that the fraud damages are speculative because of the absence of evidence as to the specific terms for any Impact stock options or whether Impact's board would have approved those specific terms. They have only referred to these issues in their briefing of the quantum meruit award. In any event, the jury could reasonably have inferred from the totality of the circumstances that Impact's board would have approved an award of $30,000 worth of stock for Brewer's consulting services, which provided critical assistance in getting the FDA's clinical hold lifted.

award.  (*Schmidt, supra*, 44 Cal.App.5th at pp. 581-582; *Slone v. El Centro Regional Medical Center* (2024) 106 Cal.App.5th 1160, 1173-1175 (*Slone*).)  In particular, they argue that the jury could award Brewer only his "out-of-pocket loss" as the fair market value of the harm he suffered and not the "benefit-of-the-bargain."  However, Brewer's fraudulent concealment claim did not seek damages for breach of contract, or as they argue, the benefit of any actual bargain with Impact, but instead reasonable compensation for the harm they caused him by their fraudulent concealment.  As discussed above, Brewer presented evidence showing that he suffered the loss of compensation that he typically would have received for his consulting services had they not fraudulently concealed information from him.  Here, the jury implicitly found that Brewer's loss of compensation was the reasonable value of stock options that he would have received from Impact had they disclosed that information.  Applying CACI No. 1923, the jury reasonably found that the fair market value of Brewer's consulting services to Defendants was the value of Impact stock options worth about $30,000 at the time he rendered those services (i.e., June and July 2017), which was $1 million according to the jury.  In so awarding compensatory damages to Brewer, the jury properly applied CACI No. 1923.  The court did not instruct the jury on the "benefit of the bargain" theory of fraud damages (CACI No. 1924), and in the absence of any contrary indication, we must presume the jury followed its instructions.  (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 803-804.)

Furthermore, in arguing the jury could award Brewer only his "out-of-pocket loss," Defendants misconstrue CACI No. 1923's instruction for the jury's valuation of Brewer's harm.  As quoted above, CACI No. 1923 instructs that the damages a plaintiff may recover for fraudulent concealment is the reasonable compensation for the harm, which is to be determined by the fair

market value of what Brewer gave (i.e., his consulting services to Defendants) less any amount of what he received (i.e., nothing). Furthermore, CACI No. 1923 instructs that fair market value is the highest price that a willing buyer would have paid on the date of the transaction (e.g., Brewer's consulting services in June and July 2017) to a willing seller, assuming that there is no pressure on either to buy or sell and that the buyer and seller know all the uses and purposes for which the services are reasonably capable of being used. CACI No. 1923 further states that the "amount of damages must include an award for *all harm* that [Defendants] [were] substantial factor[s] in causing, even if the particular harm could not have been anticipated." (Italics added.)

Here, Brewer presented both his testimony and documentary evidence showing that he had been granted stock options by other companies for his consulting services, which the jury could reasonably find as evidence showing the fair market value of his services under CACI No. 1923. Therefore, even though Brewer and Impact did not enter into a contract for his consulting services and Brewer did not pay any money out of his own pocket, the jury properly found that Brewer suffered the loss of reasonable compensation (i.e., $1 million) that he would have received had Defendants not fraudulently concealed information from him. In the circumstances of this case, CACI No. 1923 allowed Brewer to recover reasonable compensation for, or the fair market value of, the consulting services he provided to Defendants that he would have received had they not fraudulently concealed information from him.[11] (Cf. Civ. Code, § 3333 [tort damages generally are measured by "the

---

[11]     We see no inconsistency between this theory of damages for fraudulent concealment and the defense verdict on promissory fraud. Even if there was no promise of stock options, the jury could have concluded that Brewer would in fact have negotiated and received Impact stock options for his consulting

34

amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not"].)

The cases cited by Defendants in support of their argument are inapposite to this case and do not persuade us to reach a contrary conclusion. (See, e.g., *Ryan v. Crown Castle NG Networks, Inc.* (2016) 6 Cal.App.5th 775, 777, 790-795 [concluding jury received confusing instructions and returned defective verdict that reflected improper conflation of damages for breach of contract with damages for fraud (i.e., lost earnings) after finding liability for breach of contract but no liability for fraud]; *Christiansen v. Roddy* (1986) 186 Cal.App.3d 780, 790-791 [trial court erred by awarding interest based on anticipated profits from investment of funds if foreclosure sale on property had occurred instead of at legal rate on amount of actual loan]; *Stout v. Turney* (1978) 22 Cal.3d 718, 725 [using phrase, "out-of-pocket" loss in inapposite context of fraudulent property transaction claim].)  Accordingly, we conclude that the trial court erred by finding substantial evidence did not support the jury's award to Brewer of $1 million in compensatory damages on his fraudulent concealment cause of action.

E

*Denial of motion for new trial.*  Defendants argue in their cross-appeal that, assuming we reverse the trial court's order granting in part their JNOV motion, we should conclude the court erred by denying their alternative motion for new trial.  In particular, they argue the court should have granted their new trial motion because the weight of the evidence did not support the jury's finding of liability for fraudulent concealment and its awards of

---

services but for the fraudulent concealment.  For the fraudulent concealment claim, the jury instructions did not preclude the jury from calculating the value of Brewer's services by reference to the stock options he generally charged and received for his consulting work.

35

compensatory and punitive damages.  Although we have concluded that substantial evidence supports the jury's findings on liability and damages when viewing the record in the light most favorable to the verdict, we must nevertheless consider whether the trial court erred by denying Defendants' motion for new trial on liability and damages acting as an independent trier of fact or "thirteenth juror."

1.  *Liability*.  Defendants argue that the court abused its discretion by denying their motion for new trial because it expressly addressed, and rejected, only their argument that there was juror misconduct and omitted any discussion of their argument that the weight of the evidence did not support the jury's liability finding.  In support of their motion for new trial, they argued, among other things, that under section 657, subdivision (6) there was insufficient evidence to justify the jury's liability finding.  They correctly note that in deciding a motion for new trial, the court must review the evidence as "an independent trier of fact."  (*Neal v. Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 933 (*Neal*).)  In so doing, the court may disbelieve witnesses, reweigh the evidence, and make reasonable inferences from the evidence contrary to those of the jury.  (*Barrese v. Murray* (2011) 198 Cal.App.4th 494, 503 (*Barrese*).)  "[A] motion for new trial predicated on the grounds of the insufficiency of the evidence . . . is addressed to the sound discretion of the trial judge; his [or her] action in refusing a new trial will not be disturbed on appeal unless it is affirmatively shown that he [or she] abused his [or her] discretion.  [Citation.]"  (*Charles D. Warner & Sons, Inc. v. Seilon, Inc.* (1974) 37 Cal.App.3d 612, 616.)

Section 657, subdivision (6) provides that a trial court may grant a motion for new trial on the ground of "[i]nsufficiency of the evidence to justify the verdict or other decision . . . ."  Section 657 further provides:  "A new trial

36

shall not be granted upon the ground of insufficiency of the evidence to justify the verdict or other decision . . . unless after weighing the evidence the court is convinced from the entire record, including reasonable inferences therefrom, that the . . . jury *clearly* should have reached a different verdict or decision." (§ 657, italics added.) If the trial court grants a motion for new trial, its order must state the ground(s) relied on by the court and specify its reasons. (§ 657.) On appeal, if the trial court granted a new trial on the ground of insufficiency of the evidence, "it shall be conclusively presumed that said order as to such ground was made only for the reasons specified in said order or said specification of reasons . . . ." (§ 657.)

"[W]e can reverse the denial of a new trial motion based on insufficiency of the evidence . . . only if there is no substantial conflict in the evidence and the evidence compels the conclusion that the motion should have been granted." (*Fassberg Construction Co. v. Housing Authority of City of Los Angeles* (2007) 152 Cal.App.4th 720, 752 (*Fassberg Construction*).) Furthermore, "[w]e defer to the trial court's factual determination when the court grants a motion for new trial, not when the court denies such a motion. When the court denies the motion, we presume the jury's verdict is correct." (*Mammoth Lakes Land Acquisition, LLC v. Town of Mammoth Lakes* (2010) 191 Cal.App.4th 435, 473.)

Here, Defendants argue that by not expressly addressing their insufficiency of the evidence argument, the court abused its discretion by denying their new trial motion on the ground of insufficiency of the evidence to support the jury's liability finding. However, based on the record, we cannot presume the court did not consider, much less decide, that issue. Instead, we make all intendments and inferences in support of the court's order denying their motion for new trial. (*Wilson v. Sunshine Meat & Liquor*

37

*Co.* (1983) 34 Cal.3d 554, 563.) Therefore, we presume the trial court followed the law and implicitly considered and rejected Defendants' insufficiency of the evidence argument in denying their new trial motion.[12] (*Ibid.*) Moreover, the court is not required to state reasons for denying a motion for new trial. (*Laabs v. City of Victorville* (2008) 163 Cal.App.4th 1242, 1272, fn. 17.) Accordingly, Defendants have failed to demonstrate any error in the court's denial of their motion for new trial on sufficiency of evidence grounds as to liability.

2. *Compensatory damages.* Although Defendants concede the trial court erred by reducing the jury's award of compensatory damages on JNOV, they contend that even if we find sufficient evidence of liability for fraudulent concealment, we should reverse the court's order denying a new trial on the ground of excessive damages and give Brewer the option of a remittitur of the fraud damages (to either $20,000 or $100,000) or a new trial on fraud damages. They reason that the trial court was required to reduce Brewer's compensatory damages award as a matter of law because he was limited to his out-of-pocket loss for the fraudulent concealment and could not recover

---

[12]     Defendants cite the trial court's comment during trial that it was "not seeing a lot of evidence thus far substantiating a fraud case." They also cite its comments during the hearing on their JNOV motion and motion for new trial that it was having "a hard time with finding fraud based on the evidence" and "didn't see any evidence—personally [it] had a hard time finding evidence of concealment." Finally, they cite language in the court's July 3, 2023 order that in deciding their JNOV motion it viewed the evidence of fraudulent concealment to be "very 'thin' and barely sufficient to support a verdict for fraud." However, the court then concluded there was substantial evidence to support the jury's finding of liability on the fraudulent concealment cause of action. Regardless of whether the trial court viewed the evidence as strong or barely sufficient, it ultimately found the evidence of liability to be sufficient and denied the motions for JNOV and new trial on liability.

38

the benefit of the bargain he was denied. As we have explained, however, nothing in the language of CACI No. 1923 precluded the jury from valuing Brewer's consulting services based on the stock options he usually received for his work and using that to determine his fraud damages. Thus, the law as stated in the instructions given did not compel a reduction of the compensatory damages.

We decline Defendants' request that we treat the trial court's partial grant of their JNOV motion as instead a conditional grant of their new trial motion subject to denial if Brewer accepted a remittitur. Because the trial court's partial JNOV ruling was based on an erroneous belief that the evidence was legally insufficient to support the jury's damages awards even when viewing the record in the light most favorable to the jury's verdict, we cannot assume that the court would have decided to achieve the same result by ordering a remittitur and conditional new trial if it had understood that the evidence was in fact legally sufficient to support the jury's awards.

Additionally, the trial court's order did not satisfy the requirements for a valid new trial order. The trial court did not grant a new trial within the 75-day jurisdictional deadline (§ 660, subd. (c)) and did not state any reasons for granting a new trial within the additional 10-day jurisdictional deadline (§ 657) because it *denied* the motion for new trial.[13] Defendants cite no authority holding that we may treat a legally invalid partial JNOV ruling as a valid order granting a new trial on excessive damages in these

---

[13]    Section 660, subdivision (c) requires an order granting a new trial to be made within 75 days (formerly 60 days) of notice of entry of judgment by the clerk or service of notice of entry by a party. Section 657 states that the order must state the grounds for granting the motion and may contain a specification of reasons, and if it does not include the latter, the court must file a specification of reasons within 10 days after filing the order.

39

circumstances. Moreover, we cannot remand for the trial court to reconsider the motion for new trial because the jurisdictional time limits for granting a new trial and stating reasons for doing so have expired. (*Mercer v. Perez* (1968) 68 Cal.2d 104, 118-124 (*Mercer*) [appellate court cannot revive trial court's lapsed jurisdiction to state reasons for new trial under section 657 by remanding with instructions to specify reasons]; *TRC Operating Co., Inc. v. Chevron USA, Inc.* (2024) 102 Cal.App.5th 1040, 1079-1083 [appellate court may not remand matter to trial court for redetermination of motion for new trial after expiration of jurisdictional deadline to grant new trial under section 660]; *Delos v. Farmers Group, Inc.* (1979) 93 Cal.App.3d 642, 667-668 (*Delos*) [appellate court could not remand for trial court to reconsider order granting new trial on excessive damages "after the expiration of the statutory time limits"]; but see *Barrese, supra*, 198 Cal.App.4th at pp. 505-508 [holding that jurisdictional deadline of section 660 did not preclude remand for reconsideration of new trial motion, but without discussing or distinguishing Supreme Court's holding in *Mercer*].)[14]

Notably, the reasons given by the trial court for granting a partial JNOV would have been insufficient to grant a new trial on excessive damages. A conclusory statement which merely amounts to a restatement of the statutory ground for the motion is inadequate. (*Oberstein v. Bisset* (1976) 55 Cal.App.3d 184, 187.) The specification of reasons must briefly identify

---

[14] We recognize that in *Teitel*, after finding that the trial court had erred in granting partial JNOV to reduce the amount of punitive damages, the Court of Appeal remanded the matter to the trial court for reconsideration of the motion for new trial on punitive damages. (*Teitel, supra*, 231 Cal.App.3d at pp. 1604-1607.) The court did so, however, without discussing the Supreme Court's decision in *Mercer* on the remand issue or our decision in *Delos* applying *Mercer* to a motion for new trial based on excessive damages. We are bound by *Mercer*. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

the portion of the record which convinces the judge that the jury clearly should have reached a different verdict. (*Mercer*, *supra*, 68 Cal.2d at pp. 115-116.) The order should indicate the respects in which the evidence dictated a less sizeable verdict. (*Stevens v. Parke, Davis & Co.* (1973) 9 Cal.3d 51, 62 (*Stevens*).) The statement of reasons must refer to evidence, not ultimate facts. (*Oakland Raiders v. National Football League* (2007) 41 Cal.4th 624, 635 (*Oakland Raiders*).)

In granting partial JNOV on damages, the court merely stated: "Because there was a significant lack of evidence by Plaintiffs in support of fraud damages, the Court feels compelled to reduce the fraud verdict to $100,000. The $100,000 amount determined by the Court is a more realistic appraisal of Plaintiff's alleged fraud damages." The court did not identify anything *in the record* that convinced it the jury clearly should have reached a different result and did not explain the basis for rejecting the jury's $1 million award or selecting the lower $100,000 figure. As in *Stevens*, this conclusory statement "does not indicate the respects in which the evidence dictated a less sizeable verdict, and fails to hint at any portion of the record that would tend to support the judge's ruling." (*Stevens*, *supra*, 9 Cal.3d at p. 62 [finding inadequate reasons where trial court stated that jury verdict was excessive, was not sustained by the evidence, and was based on prejudice and passion on the part of the jury]; see also *Smith v. Moffat* (1977) 73 Cal.App.3d 86, 92 [finding inadequate reasons where trial court stated that size of damages award indicated a compromise verdict]; *Oberstein v. Bisset* (1976) 55 Cal.App.3d 184, 187 [finding inadequate reasons where trial court stated that there was no evidence of anything other than a very minor strain or injury].)

We agree with Defendants that the absence of a valid statement of reasons would not necessarily be fatal if the trial court had *granted* the motion for new trial and stated a proper ground for doing so within the jurisdictional time limit.  In those circumstances, the deficiency would call for independent appellate review of the order granting a motion for new trial. (*Oakland Raiders*, *supra*, 41 Cal.4th at p. 640.)  But the order we are reviewing is an order *denying* a motion for new trial, which we review for abuse of discretion.  "[W]e can reverse the denial of a new trial motion based on . . . excessive damages only if there is no substantial conflict in the evidence and the evidence compels the conclusion that the motion should have been granted." (*Fassberg Construction*, *supra*, 152 Cal.App.4th at p. 752.)  For the reasons we have explained, the evidence does not compel a conclusion that the damages awarded by the jury were excessive.

## II

### *Punitive Damages Award*

Brewer also contends that the trial court erred by finding substantial evidence did not support the jury's award to him of $4 million in punitive damages on his fraudulent concealment cause of action.  In turn, Hood contends that the jury's entire award of punitive damages against him must be vacated for lack of substantial evidence to support it or, in the alternative, must be reduced to the constitutional maximum allowed for punitive damages in the circumstances of this case.

### A

*Clear and convincing evidence*.  Here, the jury's special verdict expressly found that Hood had engaged in his fraudulent concealment

conduct "with malice, oppression, or fraud."[15]  In the second phase of the bifurcated trial, the jury awarded Brewer $4 million in punitive damages against Hood for his fraudulent concealment conduct.  In his cross-appeal, Hood contends that because substantial evidence does not support the jury's underlying finding, by clear and convincing evidence, of his liability for fraudulent concealment, its finding of liability, along with its award of punitive damages (and, as Defendants argued above, its award of compensatory damages), must be vacated.  Hood also argues, in a conclusory manner, that if we conclude substantial evidence supports the jury's finding of liability on Brewer's fraudulent concealment claim, we should nevertheless conclude that substantial evidence does not support the jury's additional finding, by clear and convincing evidence, that he engaged in that conduct with malice, oppression, or fraud.  However, in so arguing, he does not present any substantive analysis showing that Brewer did not present evidence proving, by clear and convincing evidence, that his fraudulent concealment conduct was done with malice, oppression, or fraud.  Accordingly, we conclude that Hood has not met his burden of demonstrating error on appeal.  (Cf. *Slone, supra*, 106 Cal.App.5th at pp. 1171-1172; *City of Santa Maria v. Adam* (2012) 211 Cal.App.4th 266, 286-287 [we disregard conclusory arguments that are not supported by pertinent legal authority or fail to disclose appellant's reasoning for requested conclusion].)

---

15    The trial court instructed the jury with CACI No. 3941 on the prerequisite findings for an award of punitive damages, stating in part:  "At this time, you must decide whether [Brewer] has proved by clear and convincing evidence that [Hood] engaged in conduct with malice, oppression, or fraud."  Accordingly, we presume the jury made its special verdict finding of "malice, oppression, or fraud" by clear and convincing evidence.

B

*JNOV error.*  As discussed above, with one exception, a trial court cannot grant in part a JNOV motion to reduce an award of punitive damages. That one exception applies when the trial court concludes that evidence supports an award of punitive damages, but the amount awarded by the jury exceeds constitutional bounds.  (*ENA North Beach, supra*, 43 Cal.App.5th at p. 212.)  Accordingly, we proceed to address the sole question that could have been addressed by the trial court in deciding the JNOV motion as to the amount of the damages:  whether the jury's award of $4 million in punitive damages exceeds the maximum that is constitutionally allowed in the circumstances of this case.

C

*Constitutional maximum award.*

1.  *Background.*  In the second phase of the trial on punitive damages, the court admitted in evidence the parties' stipulation that Hood's current net worth at the time of the trial was $325 million.  The court then instructed the jury with CACI No. 3949 on punitive damages, as follows:

> "You must now decide the amount, if any, that you should award [Brewer] in punitive damages.  The purposes of punitive damages are to punish a wrongdoer for the conduct that harmed the plaintiff and discourage similar conduct in the future.  There is no fixed formula for determining the amount of punitive damages and you're not required to award any punitive damages.

> "If you decide to award punitive damages, you should consider all of the following factors in determining the amount:

> "[(a)] [H]ow reprehensible was the defendant's conduct? [¶] In deciding how reprehensible the defendant's conduct was, you may consider among other factors[:]  [1.] whether the

44

conduct caused physical harm[;] [¶] [2.] whether the defendant[ ] disregarded the health or safety of others[;] [¶] [3.] whether [Brewer] was financially weak or vulnerable [and] the defendant[ ] knew [Brewer] was financially weak or vulnerable and took advantage of him[;] [¶] [4.] whether the defendant's conduct involved a pattern or practice[;] [¶] [a]nd [5.] whether the defendant[ ] acted with trickery or deceit.

"[(b)] Is there a reasonable relationship between the amount of punitive damages and [Brewer's] harm[ ] or between the amount of punitive damages and potential harm to [Brewer] that the defendant[ ] knew was likely to occur because of the conduct?

"[(c)] In view of the defendant's financial condition, what amount is necessary to punish the defendant[ ] and discourage future wrongful conduct?

"You may not increase the punitive award above an amount that is otherwise appropriate[ ] merely because the defendant[ ] [has] substantial financial resources.

"Punitive damages may not be used to punish the defendant for the impact of [his] alleged misconduct on persons other than [Brewer]."

The parties' counsel then gave their closing arguments regarding the amount of punitive damages the jury should award, if any. Brewer's counsel argued that the jury should award Brewer $25 million in punitive damages against Hood. Defendants' counsel argued that the jury should not award him any punitive damages against Hood. The jury returned a special verdict awarding Brewer $4 million in punitive damages against Hood.

In its July 3, 2023 minute order, the trial court granted in part and denied in part Defendants' JNOV motion. The court summarized Hood's arguments in support of his request that the jury's award of punitive damages against him be vacated by the court because Brewer suffered no

45

harm and, if not vacated, reduced as excessive.  The court also noted Brewer's argument that the jury's award of punitive damages was appropriate, given the degree of reprehensibility of the conduct of Hood.  The court then stated:

> "The Court does agree with [Hood] that the punitive damages verdict was grossly excessive.  The *State Farm* case [*State Farm Mutual Auto Ins. Co. v. Campbell* (2003) 535 U.S. 408] looked at: [¶] . . . The degree of reprehensibility[;] [¶] . . . The disparity between actual or potential harm suffered by [p]laintiff and the award; and [¶] . . . The relationship to comparable civil penalties[.]
>
> "The Court does agree with [Hood] that the Jury may have very well been confused on the issue of 'disregard of the health or safety of others'.
>
> "[¶] . . . [¶]
>
> "This Court found a basis (under Fraud theory) to award punitive damages but did not find a level of egregious conduct sufficient to award anything more than a minimal award of punitive damages.
>
> "This Court therefore reduces punitive damages to $100,000.  This number appears more in line with the evidence that was produced to support a fraud verdict."

Accordingly, in granting in part the JNOV motion, the court reduced the jury's award to Brewer of $4 million in punitive damages against Hood to $100,000.

2.  *Applicable law*.  In *State Farm Mut. Automobile Ins. Co. v. Campbell* (2003) 538 U.S. 408 (*State Farm*), the United States Supreme Court addressed the question of what factors courts should consider in determining whether an award of punitive damages exceeds the maximum allowed by the due process clause of the Fourteenth Amendment to the United States Constitution.  (*Id.* at pp. 412, 418-429.)  At the outset, *State*

46

*Farm* recognized that states have discretion over the imposition of punitive damages, which may be imposed for purposes of retribution or punishment and deterrence. (*Id.* at p. 416.) However, the Fourteenth Amendment's due process clause prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor. (*Ibid.*) The court recognized that in a previous case it had held that courts should consider three factors in reviewing awards of punitive damages: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." (*Id.* at p. 418, citing *BMW of North America, Inc. v. Gore* (1996) 517 U.S. 559, 575 (*Gore*).)

State Farm recognized that *Gore* stated: " '[T]he most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct.' [Citation.]" (*State Farm, supra*, 538 U.S. at p. 419, citing *Gore, supra*, 517 U.S. at p. 575.) *State Farm* stated:

> "We have instructed courts to determine the reprehensibility of a defendant by considering whether: the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident." (*State Farm*, at p. 419.)

While the absence of all of those reprehensibility factors makes an award of punitive damages suspect, the existence of one or more of those factors may not always be sufficient to sustain the award. (*State Farm, supra*, 538 U.S. at p. 419.) Because an award of compensatory damages presumably makes a plaintiff whole for their injuries, punitive damages should be awarded only if

47

the defendant's culpability, after paying compensatory damages, is so reprehensible as to warrant the imposition of further sanctions for punishment or deterrence. (*Ibid.*) *State Farm* further stated: "A defendant's dissimilar acts, independent from the acts upon which liability was premised, may not serve as the basis for punitive damages. A defendant should be punished for the conduct that harmed the plaintiff, not for being an unsavory individual or business." (*Id.* at pp. 422-423.)

Regarding the second factor, *State Farm* "decline[d] . . . to impose a bright-line ratio which a punitive damages award cannot exceed." (*State Farm, supra*, 538 U.S. at p. 425.) Nevertheless, the court noted: "[I]n practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." (*Ibid.*) The court cited one of its own prior decisions concluding "that an award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety" and noted that "we cited that 4-to-1 ratio again in *Gore*" and also "referenced a long legislative history, dating back over 700 years and going forward to today, providing for sanctions of double, treble, or quadruple damages to deter and punish." (*Ibid.* [citing *Gore, supra*, 517 U.S. at p. 581].) *State Farm* stated: "While these ratios are not binding, they are instructive. They demonstrate what should be obvious: Single-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution, than awards with ratios in range of 500 to 1, . . . or, in this case, of 145 to 1." (*State Farm*, at p. 425.)

Nevertheless, greater ratios "may comport with due process where 'a particularly egregious act has resulted in only a small amount of economic damages.' [Citation.]" (*State Farm, supra*, 538 U.S. at p. 425.) "The converse

48

is also true, however. When compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee. The precise award in any case, of course, must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff." (*Ibid.*) *State Farm* concluded: "In sum, courts must ensure that the measure of punishment is both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered." (*Id.* at p. 426.) Because in the circumstances of that case the jury's compensatory damages award of $1 million was substantial and completely compensated the plaintiffs for the harm they suffered (i.e., minor economic harm and emotional distress), the court concluded the 145:1 ratio of punitive damages to compensatory damages exceeded that permitted by the due process clause. (*Ibid.*) The court further noted that the "wealth of a defendant cannot justify an otherwise unconstitutional punitive damages award." (*Id.* at p. 427.) *State Farm* stated: "The principles set forth in *Gore* must be implemented with care, to ensure both reasonableness and proportionality." (*Id.* at p. 428.)

Regarding the third factor, *State Farm* simply noted that in the past it had considered criminal penalties that could be imposed for a defendant's conduct. (*State Farm, supra*, 538 U.S. at p. 428.) While the existence of a criminal penalty supports a finding of seriousness of that conduct, it has less utility in determining the amount of a punitive damages award. (*Ibid.*) The court also cautioned that "[p]unitive damages are not a substitute for the criminal process." (*Ibid.*)

Therefore, applying the *Gore* factors to the circumstances in its case, *State Farm* reversed the jury's award of $145 million in punitive damages and remanded the matter for the Utah courts to resolve, in the first instance,

49

the question of the maximum amount of punitive damages allowed in that case. (*State Farm, supra*, 538 U.S. at p. 429.) In so doing, the court stated: "An application of the *Gore* guideposts to the facts of this case, especially in light of the substantial compensatory damages awarded (a portion of which contained a punitive element), likely would justify a punitive damages award at or near the amount of compensatory damages." (*Ibid.*)

A plethora of subsequent decisions have applied the *State Farm* factors to the circumstances of their cases and reduced, or affirmed trial court reductions of, awards of punitive damages to single-digit ratios of punitive to compensatory damages (i.e., less than 10:1). (See, e.g., *Roby v. McKesson Corp.* (2009) 47 Cal.4th 686, 719-720 (*Roby*) [given low degree of defendant's reprehensibility and substantial award of noneconomic damages, court reduced punitive damages to 1:1 ratio]; *Pilliod v. Monsanto Co.* (2021) 67 Cal.App.5th 591, 647-649 [given defendant's reprehensible conduct which caused plaintiffs' cancer and remained undeterred by prior awards of punitive damages, appellate court affirmed trial court's reduction of punitive damages to ratio of 4:1]; *Contreras-Velazquez v. Family Health Centers of San Diego, Inc.* (2021) 62 Cal.App.5th 88, 108-111 [given moderate reprehensibility of defendant's conduct and substantial compensatory damages which included punitive element that was somewhat duplicative of punitive damages award, trial court's reduction of punitive damages to 2:1 ratio was affirmed]; *King v. U.S. Bank National Assn.* (2020) 53 Cal.App.5th 675, 681, 730-731 (*King*) [given low reprehensibility of defendant's conduct and large $8,689,696 amount of compensatory damages which included punitive component, court reduced punitive damages to 1:1 ratio]; *Johnson v. Monsanto Co.* (2020) 52 Cal.App.5th 434, 461-463 (*Johnson*) [given large $10,253,209.32 amount of compensatory damages which included punitive

element, court affirmed trial court's reduction to 1:1 ratio for punitive damages]; *Colucci v. T-Mobile USA, Inc.* (2020) 48 Cal.App.5th 442, 458-460 [given low-to-moderate reprehensibility of defendant's conduct and substantial $1,020,042 compensatory damages which contained punitive component, punitive damages reduced to 1.5:1 ratio]; *Izell v. Union Carbide Corp.* (2014) 231 Cal.App.4th 962, 985-989 [given high reprehensibility of defendant's conduct and defendant's $4.2 billion net worth, court affirmed trial court's reduction of punitive damages to 4.62:1 ratio]; *Jet Source Charter, Inc. v. Doherty* (2007) 148 Cal.App.4th 1, 11 (*Jet Source*) [given substantial $6.5 million compensatory damages, punitive damages reduced to 1:1 ratio]; *Textron Financial Corp. v. National Union Fire Ins. Co.* (2004) 118 Cal.App.4th 1061, 1083 [court reduced punitive damages to 4:1 ratio]; *Walker v. Farmers Ins. Exchange* (2007) 153 Cal.App.4th 965, 972-975 (*Walker*) [given substantial $1.5 million compensatory damages which included punitive element, appellate court affirmed trial court's reduction of punitive damages to 1:1 ratio].)

In *Simon v. San Paolo U.S. Holding Co., Inc.* (2005) 35 Cal.4th 1159, 1189-1190 (*Simon*), our Supreme Court found a 10:1 ratio to be the constitutional maximum in a promissory fraud case. *Simon* involved promissory fraud committed by a seller against a prospective buyer of an office building. (*Id.* at p. 1166.) The jury awarded the plaintiff, the prospective buyer, $5,000 in economic compensatory damages and $2.5 million in punitive damages. (*Id.* at p. 1170.) After the plaintiff declined the trial court's grant of the seller's motion for new trial conditioned on the plaintiff's acceptance of a reduction in the amount of punitive damages, a retrial was conducted and the new jury awarded the plaintiff $1.7 million in punitive damages. (*Ibid.*) The seller argued that the punitive damages

51

awarded exceeded the maximum amount permitted under the Fourteenth Amendment's due process clause. (*Id.* at p. 1171.)

Our Supreme Court in *Simon* restated *State Farm*'s three factors, which appellate courts independently assess in determining the maximum amount of punitive damages in the circumstances of a particular case. (*Simon, supra*, 35 Cal.4th. at p. 1172.) Applying the first *State Farm* factor of reprehensibility of the tortious conduct to the circumstances in its case, *Simon* noted that the seller's tortious conduct caused only economic harm and did not show disregard of others' health or safety. (*Id.* at p. 1180.) The court further noted that the plaintiff's financial vulnerability was essentially neutral, given that it was an arm's-length transaction on which the plaintiff's economic survival or security was not dependent. (*Ibid.*) It also noted that although the seller's tortious conduct could be characterized as more than a single isolated incident spanning over several weeks, the tortious conduct was a single false promise and there was no evidence the seller had acted similarly toward other potential buyers. (*Ibid.*) Lastly, the court concluded that the fifth reprehensibility subfactor applied because the seller's intentional false promise constituted intentional deceit under *State Farm*. (*Id.* at p. 1181.) Therefore, *Simon* concluded that because only one of the five reprehensibility subfactors applied in its case, the seller's false promise must be regarded as of "relatively low culpability." (*Ibid.*)

Regarding the second *State Farm* factor, *Simon* interpreted *State Farm* to mean that ratios "significantly greater than 9 or 10 to 1" are presumptively invalid and require special justification to satisfy due process. (*Simon, supra*, 35 Cal.4th at p. 1182.) "Multipliers *less* than nine or 10 are not, however, presumptively *valid* under *State Farm*. Especially when the compensatory damages are substantial or already contain a punitive element, lesser ratios

'can reach the outermost limit of the due process guarantee.' [Citation.]" (*Ibid.*, citing *State Farm, supra,* 538 U.S. at p. 425.) In the circumstances of its case, *Simon* concluded that the jury's award of $1.7 million in punitive damages, which represented a ratio of 340:1 to the $5,000 amount of compensatory damages, was grossly excessive. (*Simon*, at p. 1183.)

Regarding the third *State Farm* factor, *Simon* noted that factor was less useful because the seller's false promise tortious conduct did not lend itself to a comparison to statutory civil penalties. (*Simon, supra*, 35 Cal.4th at pp. 1183-1184.) Therefore, the court concluded that factor did not tend to support the jury's award of $1.7 million in punitive damages. (*Id.* at p. 1184.)

Finally, *Simon* addressed the role that the seller's wealth or financial condition could play in determining the maximum amount of punitive damages that was constitutionally permissible. (*Simon, supra*, 35 Cal.4th at p. 1184.) The court noted that Civil Code section 3294, subdivision (a) permits a plaintiff to recover punitive damages " 'for the sake of example and by way of punishing the defendant' " where the defendant's oppression, fraud, or malice has been proven by clear and convincing evidence. (*Simon*, at p. 1184.) *Simon* stated: "[T]he *defendant's financial condition is an essential factor in fixing an amount that is sufficient to serve these goals* without exceeding the necessary level of punishment." (*Id.* at p. 1185, italics added.) The court stated: " '[O]bviously, the function of deterrence . . . will not be served if the wealth of the defendant allows him to absorb the award with little or no discomfort.' [Citation.]" (*Ibid.*, citing *Neal, supra*, 21 Cal.3d at p. 928.) "On the other hand, 'the purpose of punitive damages is not served by financially destroying a defendant.' [Citation.]" (*Simon*, at p. 1185, citing *Adams v. Murakami* (1991) 54 Cal.3d 105, 112.) Accordingly, *Simon* concluded: "Because a court reviewing the jury's award for due process

53

compliance may consider what level of punishment is necessary to vindicate the state's legitimate interests in deterring conduct harmful to state residents, the *defendant's financial condition remains a legitimate consideration in setting punitive damages.* [Citation.]" (*Simon*, at p. 1185, italics added, citing *State Farm, supra*, 538 U.S. at p. 428 [use of wealth as a factor is not " 'unlawful or inappropriate' "].) Therefore, "in determining whether a lesser award [of punitive damages] 'could have satisfied the State's legitimate objectives' [citation], a reviewing court may nonetheless give some consideration to the defendant's financial condition." (*Simon*, at p. 1186, fn. omitted, citing *State Farm*, at p. 420.) In the circumstances of its case, *Simon* concluded that the seller's substantial wealth (whether the seller's $46 million at the time of the tortious conduct or $4.8 million two years after that conduct and the seller's transfer of funds to its corporate parent) could not justify the jury's $1.7 million award of punitive damages.[16] (*Simon*, at p. 1187 & fn. 10.)

Concluding that the jury's award of $1.7 million in punitive damages was grossly excessive, *Simon* then elected to forego a remittitur and instead independently determine what amount of punitive damages was constitutionally permitted. (*Simon, supra*, 35 Cal.4th at pp. 1187-1188.) *Simon* concluded: "Referring to our earlier reprehensibility analysis and using the comparisons to compensatory damages and civil penalties for calibration, we conclude the maximum [amount of punitive damages constitutionally permitted] here lies at $50,000, or 10 times the compensatory [damages] award." (*Id.* at p. 1188.) The court explained: "Here the $5,000

---

16    Considering those two amounts, *Simon* noted that the higher $46 million amount "more closely reflect[ed] [the seller's] condition at the time of the tortious acts whose repetition or imitation the law seeks to deter." (*Simon, supra*, 35 Cal.4th at p. 1187, fn. 10.)

award was for purely economic damages containing no punitive element and is quite small. . . . The nature and size of the compensatory award here thus militates for a maximum award at the top of, but not significantly beyond, the single-digit range." (*Id.* at p. 1189.) The court noted that a penalty of $50,000 was not in absolute size extraordinary for fraudulent conduct, but also was not "so minor, even accounting for [the seller's] wealth, that it can be completely ignored, especially when imposed for conduct that led to no profit for the [seller]; even a prosperous company would ordinarily take reasonable measures to prevent the recurrence of a $50,000 net loss." (*Ibid.*) Accordingly, *Simon* concluded that $50,000 was the maximum amount of punitive damages that could be awarded consistent with due process in the circumstances of its case. (*Ibid.*)

3. *Analysis.* In his appeal, Brewer argues that the trial court erred by finding that the jury's award to him of $4 million in punitive damages was grossly excessive and that Hood's fraudulent concealment conduct did not support anything more than a minimal award of $100,000 in punitive damages. He also argues that the court did not find that $100,000 was the maximum amount allowed under the Fourteenth Amendment's due process clause for punitive damages in the circumstances of this case, nor did it conduct any analysis of the *State Farm* factors in support of its award reduction. Although the trial court's July 3, 2023 minute order restated the due process arguments made by Hood in support of his JNOV motion and even noted the three *State Farm* factors, its minute order did *not*, contrary to the apparent assertion by Hood, set forth any substantive analysis or other discussion applying those three *State Farm* factors to the circumstances of this case. In the absence of such discussion, we infer that the trial court did not conduct any independent analysis of those factors, nor did it

independently determine what the constitutional maximum amount of punitive damages was permitted in the circumstances of this case. Rather, as Brewer argues, the record shows that the court simply reweighed the evidence in granting in part the JNOV motion and found, contrary to the jury's verdict, that a $100,000 award of punitive damages against Hood was "more in line with the evidence."

As discussed above, we conclude that the trial court erred to the extent it granted in part the JNOV motion and reduced the jury's award of punitive damages against Hood based on its reweighing of the evidence. (*ENA North Beach, supra*, 43 Cal.App.5th at pp. 210-212; *Teitel, supra*, 231 Cal.App.3d at pp. 1596, 1602.) Therefore, we solely address the independent question of law regarding the maximum amount of punitive damages that was constitutionally permitted in the circumstances of this case. We review this question de novo, accepting as true the jury's findings of historical fact as long as they are supported by substantial evidence. (*Simon, supra*, 35 Cal.4th at p. 1172.)

Applying the *State Farm* factors to the circumstances in this case, we conclude that the jury's award to Brewer of $4 million in punitive damages against Hood does *not* exceed the maximum amount permitted by the Fourteenth Amendment's due process clause. On the reprehensibility subfactors, the first subfactor does not apply because the harm caused to Brewer by Hood was not physical and was instead solely economic. (*State Farm, supra*, 538 U.S. at p. 419.) We also conclude, as Hood argues, that the second subfactor does not apply because his tortious conduct did not show an indifference to, or disregard of, the health or safety of Brewer or others similarly situated. (*Ibid.*) In particular, we note that Hood's tortious conduct involved fraudulent concealment from Brewer, a consultant, information that

56

he should have disclosed to him, which resulted in economic harm to Brewer (i.e., deprived him of the value of Impact stock options) and therefore did not involve any risk to his health or safety. Likewise, Hood's fraudulent conduct did not show an indifference to, or disregard of, the health or safety of other consultants to him (or Impact) who were similarly situated to Brewer.

Brewer argues the phrase "health or safety of others," as used in CACI No. 3949 and *State Farm*, should also be interpreted as including the risk posed to patients who may take fedratinib based on the FDA's approval of that drug, which was based, in part, on Hood's misrepresentations to the FDA regarding Brewer's assessments of the eight patients and his purported opinion regarding its safety. As Hood suggests, however, the phrase "health and safety of others" refers to the disregard of the health and safety of those persons who are similarly situated to Brewer. (*State Farm, supra*, 538 U.S. at p. 419.) Accordingly, the second subfactor does not apply here.

The third subfactor does not apply because Brewer was not financially vulnerable. (*State Farm, supra*, 538 U.S. at p. 419.) In particular, the record does not show that the fraudulent concealment by Hood took advantage of any financial vulnerability of Brewer. And the fourth subfactor does not apply because the fraudulent concealment was essentially an isolated incident, even though it occurred over a period of time (e.g., June and July 2017), and did not involve repeated acts of fraudulent concealment. (*Ibid.*; cf. *Simon, supra*, 35 Cal.4th at p. 1180 [although seller's tortious conduct could be characterized as more than a single isolated incident spanning over several weeks, tortious conduct was a single false promise and there was no evidence seller had acted similarly toward other potential buyers].)

Regarding the fifth subfactor of reprehensibility, we conclude, as the parties agree, that the harm caused Brewer by Hood's fraudulent

57

concealment was the result of intentional malice, trickery, or deceit and not mere accident. (*State Farm, supra*, 538 U.S. at p. 419.) In particular, we note that the jury's special verdict expressly found that Hood "intentionally fail[ed] to disclose" to Brewer certain facts and his concealment of those facts was done with an "inten[t] to deceive" him. Clearly, the fifth subfactor therefore applies in support of the jury's award of punitive damages against Hood. (*Ibid*.) Therefore, we conclude that, as in *Simon*, this is the only one of the five reprehensibility subfactors that applies in the circumstances of this case, thereby placing the fraudulent concealment conduct of Hood on the relatively low end of reprehensibility under *State Farm*. (Cf. *Simon, supra*, 35 Cal.4th at p. 1181.)

On the second *State Farm* factor of the disparity between the actual harm suffered by Brewer (i.e., $1 million in compensatory damages for fraudulent concealment) and the jury's punitive damages award of $4 million, we conclude the 4:1 ratio of punitive to compensatory damages does *not* exceed the limitations on ratios as set forth in *State Farm* and *Simon*. (*State Farm, supra*, 538 U.S. at pp. 419, 425-426; *Simon, supra*, 35 Cal.4th at p. 1182.) In determining whether the jury's award of punitive damages in this case exceeded the maximum amount constitutionally permitted, we are mindful of *State Farm*'s guidelines for acceptable ratios of punitive to compensatory damages. First, we note that *State Farm* "decline[d] . . . to impose a bright-line ratio which a punitive damages award cannot exceed." (*State Farm*, at p. 425.) Nevertheless, the court noted that few awards that exceed a single-digit ratio (i.e., 9:1 ratio) between punitive and compensatory damages, to a significant degree, would satisfy due process. (*Ibid*.) *State Farm* noted cases in which a 4:1 ratio was the maximum allowed, stated those ratios are instructive, and demonstrated that single-digit multipliers

are more likely to comport with due process while achieving the State's goals of deterrence and retribution. (*Ibid.*) Nevertheless, "[w]hen compensatory damages are substantial, then a lesser ratio, *perhaps only equal to compensatory damages*, can reach the outermost limit of the due process guarantee." (*Ibid.*, italics added.) *State Farm* further noted that the "wealth of a defendant cannot justify an otherwise unconstitutional punitive damages award." (*Id.* at p. 427.)

In *Simon*, the court restated *State Farm*'s guidelines for punitive to compensatory damages ratios. (*Simon, supra*, 35 Cal.4th at pp. 1182-1188.) In particular, it noted that when the compensatory damages are substantial or already contain a punitive element, ratios less than 9:1 or 10:1 can reach the maximum amount constitutionally permitted. (*Id.* at p. 1182.) Given the small $5,000 amount of compensatory damages awarded which did not include any punitive element, *Simon* concluded that a ratio at the high end of *State Farm*'s general single-digit ratio guideline (specifically, a 10:1 ratio) should apply in the circumstances of its case. (*Simon*, at pp. 1188-1189.) *Simon* further concluded that the $50,000 amount of punitive damages represented by that 10:1 ratio would not exceed the constitutional maximum given the seller's wealth. (*Id.* at p. 1189.)

Under *State Farm* and *Simon*, to determine the maximum permissible ratio, we must consider whether the jury's $1 million compensatory damages award was substantial or contained a punitive element. Importantly, the question is not simply whether the jury's award was substantial in the abstract. Although $1 million is a large sum of money, "whether the compensatory damages are 'small' or 'substantial' within the meaning of *State Farm . . .* depends, in substantial part, on the defendant's financial condition." (*Bullock v. Philip Morris USA, Inc.* (2011) 198 Cal.App.4th 543,

59

565, fn. 11 (*Bullock*); accord *Izell v. Union Carbide Corp.* (2014) 231 Cal.App.4th 962, 988.) This is "[b]ecause the state's legitimate interests in punishment and deterrence are not served if the amount of punitive damages is so small relative to the defendant's wealth as to constitute only a nuisance or a routine cost of doing business [citation], and because a punitive damages award violates due process only if the award is ' " 'grossly excessive' in relation to these interests" ' . . . ." (*Bullock,* at p. 565, fn. 11.)

Here, the jury's $1 million compensatory damages award cannot be considered substantial in relation to Hood's financial condition. During the second phase of the trial, Hood stipulated that his net worth at that time was $325 million. Thus, the jury's compensatory damages award was only about 0.3 percent of Hood's net worth, and the punitive damages award was slightly more than 1 percent of Hood's net worth, which the jury could reasonably find was necessary to achieve the goals of punishment and deterrence. (*Simon, supra*, 35 Cal.4th at p. 1185; see also *ENA North Beach, supra*, 43 Cal.App.5th at p. 214 [punitive damages generally should not exceed 10 percent of defendant's net worth].) As *Simon* emphasized, a "defendant's financial condition is an essential factor in fixing an amount that is sufficient to serve" the goals of punishment and deterrence.[17] (*Simon*, at p. 1185.)

---

[17] Hood relies on this court's decision in *Jet Source*, *supra*, 148 Cal.App.4th 1, which concluded that a 1:1 ratio was the constitutional maximum in a case involving a breach of fiduciary duty by aircraft dealers in negotiating the purchase prices of aircraft for an aircraft chartering company. (*Id*. at pp. 4-11.) We do not find the defendants' conduct in *Jet Source* to be comparable to the fraudulent concealment at issue here. Moreover, the court there did not discuss whether the total compensatory damages award was substantial in relation to the defendants' financial condition. (*Id*. at p. 11.) Although the court rejected one individual defendant's argument that his pro rata share of the reduced punitive damages would be disproportionate to

Nor did the jury's compensatory damages award include any punitive element. *State Farm* noted a particular concern with cases involving substantial emotional distress awards for humiliation or indignation, which may already "contain [a] punitive element." (*State Farm, supra*, 538 U.S. at p. 426.) Many subsequent cases finding a lower 1:1 ratio to be the maximum under *State Farm* have involved substantial jury awards for emotional distress, which may "reflect[ ] the jury's indignation" at the defendant's conduct, "thus including a punitive component." (*Roby, supra*, 47 Cal.4th at pp. 719-720; see also *King, supra*, 53 Cal.App.5th at pp. 730-731; *Johnson, supra*, 52 Cal.App.5th at pp. 461-463; *Walker, supra*, 153 Cal.App.4th at pp. 972-975; but see *Bullock, supra*, 198 Cal.App.4th at p. 567 [approving 16:1 ratio where circumstances did not suggest that emotional distress damages awarded by jury were for outrage or humiliation or reflected indignation at defendant's conduct].)

In this case, the jury's compensatory damages award was solely for the economic loss of the value of Impact stock options and thus did not include any punitive component. The court gave no jury instructions on noneconomic damages and the jury's verdict did not include any noneconomic damages. As we have explained, the jury's $1 million award was also supported by the evidence of Brewer's economic loss and did not suggest a runaway jury inflamed by passion. Thus, there is no basis in the record to conclude that the jury's compensatory damages award included an award for Brewer's outrage or humiliation or reflected indignation at Hood's conduct.

Because the compensatory damages awarded by the jury were not substantial in relation to Hood's net worth, and did not include a punitive

his ability to pay (*id*. at p. 11, fn. 7), the opinion gives no indication of the defendants' net worth in relation to the damages awarded.

element, a 4:1 ratio of punitive to compensatory damages is not constitutionally excessive.  This is a single-digit ratio that amounts to less than half of what it would take to reach the presumptively invalid range of "significantly greater than 9 or 10 to 1." (*Simon, supra*, 35 Cal.4th at p. 1182.)  Though not dispositive, the 4:1 ratio also comports with a longstanding legislative tradition "dating back over 700 years and going forward to today, providing for sanctions of double, treble, or quadruple damages to deter and punish." (*State Farm, supra*, 538 U.S. at p. 425.)  Furthermore, the jury's $4 million award would not financially destroy Hood. (*Simon*, at p. 1185.)

On *State Farm*'s third factor, we conclude, as the parties agree, that there are no civil penalties that are comparable to the fraudulent concealment conduct of Impact and Hood. (*State Farm, supra*, 538 U.S. at p. 428.)  Therefore, we do not consider that factor in determining the maximum amount of punitive damages that is constitutionally permitted.

In sum, independently considering *State Farm*'s three factors and the facts and circumstances in this case, including Hood's $325 million net worth, we conclude that the jury's award to Brewer of $4 million in punitive damages against Hood did not exceed the amount constitutionally permissible under the Fourteenth Amendment's due process clause.  We emphasize that our "constitutional mission" is only to determine whether the jury's award exceeds the due process maximum; "it is not to find the 'right' level" in our own view. (*Simon, supra*, 35 Cal.4th at p. 1188.)  The court "does not sit as a replacement for the jury but only as a check on arbitrary awards." (*Ibid.*)

## III

### *Quantum Meruit Damages*

Brewer contends that the trial court prejudicially erred in instructing the jury on quantum meruit damages. In particular, he argues that the court erred by instructing the jury that in determining the reasonable value of his services it could not consider the value of an equity or ownership interest in any party (i.e., Impact). He also argues that the court erred by excluding certain evidence on the value of stock or equity in Impact. Finally, he argues the court erred in instructing the jury that it also could not consider the value of any benefit his services may have conferred on the recipient (i.e., Impact or Hood).

### A

*Applicable law.* A quantum meruit cause of action is a common count to recover the value of goods or services that benefited another party. "A quantum meruit or quasi-contractual recovery rests upon the equitable theory that a contract to pay for services rendered is implied by law for reasons of justice." (*Hedging Concepts, Inc. v. First Alliance Mortgage Co.* (1996) 41 Cal.App.4th 1410, 1419.) "The measure of recovery in *quantum meruit* is the reasonable value of the services rendered, provided they were of direct benefit to the defendant." (*Palmer v. Gregg* (1967) 65 Cal.2d 657, 660.) Therefore, "recovery in quantum meruit does not require a contract. [Citations.]" (*Maglica v. Maglica* (1998) 66 Cal.App.4th 442, 449 (*Maglica*), fn. omitted.) "The underlying idea behind quantum meruit is the law's distaste for unjust enrichment. If one has received a benefit which one may not justly retain, one should 'restore the aggrieved party to his [or her] former position by return of the *thing* or its *equivalent* in money.' [Citation.]" (*Ibid.*) Therefore, a threshold requirement for a quantum meruit claim is that the

63

defendant must have received some benefit from the plaintiff's goods or services. (*Id.* at p. 450.) However, that requirement does not mean the reasonable value of the plaintiff's goods or services may be measured by the value "by which the defendant was 'benefited' as a *result* of" those goods or services. (*Ibid.*) Rather, "[t]he legal test for recovery in quantum meruit is not the value of the benefit, but value of the services (assuming, of course, that the services were beneficial to the recipient in the first place)." (*Id.* at p. 446.)

B

*Background.* Before trial, Defendants filed a motion in limine requesting that the trial court exclude evidence of equity valuation as irrelevant to Brewer's quantum meruit claim. In particular, they argued that *Maglica* held that the value of services cannot be measured or determined based on a plaintiff's claim to equity in a company. They also sought to bifurcate the liability and punitive damages portions of the trial. Brewer opposed the in limine motion, arguing that *Maglica* did not create a universal rule for quantum meruit damages, but addressed only the circumstances in that case. Brewer cited other cases in which the courts held that the reasonable value of a plaintiff's services were determined by factors other than an hourly wage. (See, e.g., *Watson v. Wood Dimension, Inc.* (1989) 209 Cal.App.3d 1359 (*Watson*) [reasonable value based on 3 percent commission for orders obtained from plaintiff's services]; *Cazares v. Saenz* (1989) 208 Cal.App.3d 279 (*Cazares*) [reasonable value of legal services based on attorney's contingency fee agreement].)

The trial court denied the motion in limine, but granted the request to bifurcate the trial. While acknowledging that *Maglica* was "a pretty strong" case that would preclude valuation of Brewer's services by an equity interest

64

in Impact, the court ruled that Brewer could present evidence on equity valuation. The court nevertheless noted that it would decide what evidence it would admit during trial on a "question by question and objection by objection" basis.

At trial, as discussed above, Brewer presented his testimony and documentary evidence showing that his regular practice was to require, as compensation, stock options for the stock of the companies for which he provided consulting services. Furthermore, as discussed above, Gkatzimas opined, assuming Brewer had received such stock options from Impact for his consulting services, that there was a range in the current value of those stock options depending on the date they would have been granted and whether their value on the grant date was $30,000 or $40,000.

Out of the jury's presence, Defendants' counsel cited *Maglica* and requested that the court modify Brewer's proposed jury instruction on quantum meruit damages with language precluding the jury from considering the value of equity he may have received from Impact and the value of the benefit to Defendants that they received from Brewer's services. Brewer's counsel opposed that modification, arguing in part that quantum meruit does not limit a plaintiff's recovery to only an hourly wage for services provided and the jury should be able to consider the value of Impact stock options that Brewer should have received for his services. The trial court agreed with Defendants' argument and concluded that *Maglica* required their proposed modification to the instruction on quantum meruit damages.

In closing, Defendants' counsel argued, among other things, that the jury would be instructed by the court that it could not consider the value of an equity or ownership interest in any party, such as the value of Impact stock options, in determining quantum meruit damages. He argued that the

65

jury should award Brewer, at most, an hourly wage for the consulting services he provided to them, such as the $600, $650, or $1,000 hourly fees charged by other Impact consultants, for a total award of $5,000 to $10,000. He argued that the jury could not award Brewer the value of Impact stock options in determining quantum meruit damages. In rebuttal, Brewer's counsel argued that the reasonable value of Brewer's services should be found to be an "extraordinary sum," which would not be $10,000, but instead could be $10 million, $25 million, or $50 million. He argued the amount of that extraordinary sum would be left to the jury to determine.

After counsel's closing arguments, the trial court instructed the jury, including CACI No. 371 on the elements of a common count for quantum meruit and the modified special instruction on quantum meruit damages. In particular, the court instructed on quantum meruit damages, as follows:

> "The measure of recovery in quantum meruit is the reasonable value of the services. Reasonable value is the price that a hypothetical willing buyer would pay a hypothetical willing seller for the services, neither being under compulsion to buy or sell, and both having full knowledge of all pertinent facts. Reasonable value can be described as the 'going rate' to obtain those services from another person in the market. *When determining the reasonable value of the services, you should not consider (1) the value of any resulting benefit those services may have conferred on the recipient, or (2) the value of an equity or ownership interest in any party*." (Italics added.)

The jury thereafter returned its special verdict, finding Defendants liable to Brewer on his quantum meruit cause of action and awarding him $20,000 in quantum meruit damages. On July 26, 2023, the court entered a revised judgment, which, in part, awarded Brewer $20,000 in damages on his quantum meruit cause of action.

C

*Analysis.* On appeal, Brewer primarily argues that the trial court erred by relying on *Maglica* and instructing the jury that it could not consider the value of an equity or ownership interest in any party (i.e., Impact) in determining quantum meruit damages. He also argues that the court erred by instructing the jury that it could not consider the value of any benefit that Defendants may have received from his consulting services.

1. *Maglica.* Because, as discussed above, the trial court found *Maglica, supra*, 66 Cal.App.4th 442, to be dispositive of the instant questions regarding quantum meruit damages, we first discuss the circumstances in that case and its statements regarding quantum meruit damages. In *Maglica*, the court addressed quantum meruit damages in the context of two unmarried cohabitants. (*Id.* at p. 445.) The defendant started his own machine shop in 1955 and met the plaintiff in 1971. (*Id.* at p. 447.) They held themselves out as husband and wife, while working together building his business, which he retained as his sole property. (*Ibid.*) The plaintiff and the defendant were paid equal salaries by the business for their services. (*Ibid.*) Due in part to the plaintiff's ideas and hard work, the business grew and became worth hundreds of millions of dollars. (*Ibid.*) In 1992, their relationship ended and the plaintiff thereafter filed an action against the defendant, alleging, among other things, a cause of action for quantum meruit. (*Ibid.*) At trial, the trial court instructed the jury on quantum meruit damages: " '[The] [p]laintiff may be compensated for the reasonable value of services rendered to [the] [d]efendant and [his company] either by awarding [the] [p]laintiff: [¶] 1. The reasonable value of what it would have cost [the] [d]efendant to obtain the services [the] [p]laintiff provided from another person; or [¶] 2. The value by which [the] [d]efendant has benefited as a result of the services rendered by [the] [p]laintiff.' " (*Id.* at p. 450, fn. 6.)

67

The jury returned a verdict awarding the plaintiff $84 million in damages on her quantum meruit cause of action based on the growth in the value of the defendant's business during their relationship. (*Id.* at p. 447.)

On appeal, *Maglica* held that the trial court erred in instructing the jury on quantum meruit damages. (*Maglica, supra*, 66 Cal.App.4th at p. 452.) The court concluded that, contrary to the trial court's instructions, the reasonable value of a plaintiff's services in a quantum meruit action cannot be based on the value of the benefit a defendant received from the plaintiff's services. (*Id.* at pp. 446, 450-452.) Although a quantum meruit claim requires a threshold showing that the defendant received some benefit from the plaintiff's services, the court explained that benefit is not necessarily related to the reasonable value of the plaintiff's services. (*Id.* at p. 451.) *Maglica* stated:

> "Allowing recovery based on resulting benefit would mean the law imposes an exchange of equity for services, and that can result in a windfall—as in the present case—or a serious shortfall in others. Equity-for-service compensation packages are extraordinary in the labor market, and always the result of specific bargaining. To impose such a measure of recovery would make a deal for the parties that they did not make themselves. . . . [Courts cannot] use quantum meruit to impose a highly generous and extraordinary contract that the parties did not make."
> (*Ibid.*)

*Maglica* stated that the trial court's instruction erroneously allowed the jury to determine the reasonable value of the plaintiff's services based on the value of the *benefit* the defendant received from her services (i.e., $84 million), rather than on "the going rate for the services of even the most workaholic manager. In substance, the court was allowing the jury to value the plaintiff's services as if she had made a sweetheart stock option deal—yet such a deal was precisely what the jury found she did not make." (*Id.* at

68

p. 446.) *Maglica* concluded that the trial court's erroneous instruction "allowed the jury to value [the plaintiff's] services as having bought her a de facto ownership interest in a business whose owner never agreed to give her an interest." (*Id.* at p. 452.)

Although the language of *Maglica* could be interpreted to set forth a universal rule that the reasonable value of services in determining quantum meruit damages can *never* be based on the value of an equity interest in a defendant, we believe this language is overbroad and should be limited to the facts and circumstances in that case. First, we note that the jury instruction given by the trial court in *Maglica* expressly allowed the jury to consider the value of the *benefit* that the defendant received from the plaintiff's services. (*Maglica, supra*, 66 Cal.App.4th at p. 450, fn. 6.) Based on that instruction, the jury presumably found that the defendant benefited from the plaintiff's services in the amount of $84 million. (*Id.* at p. 447.) Importantly, it was only in the context of that instruction that *Maglica* addressed the question of whether a plaintiff may recover in quantum meruit the increase in the value of a defendant's business resulting from the plaintiff's services (i.e., the value of the benefit received by the defendant from the plaintiff's services).

*Maglica* concluded that the plaintiff could not recover the resulting increase in the value of the defendant's business, but only the reasonable value of her services as a manager of the business (which the court implied would be "the going rate" for managerial services). (*Maglica, supra*, 66 Cal.App.4th at p. 446.) In the specific factual context of *Maglica*, the reasonable value, or "going rate," of the plaintiff's services presumably could have been shown by evidence of what the plaintiff historically had received, or other comparable managers had received, for their services. The plaintiff

69

had been paid a salary for her managerial services during their entire 21-year relationship, and the defendant retained sole ownership of his business. Unlike the circumstances in our case, there was no evidence in *Maglica* that the parties had discussed giving the plaintiff an equity or ownership interest in the defendant's business for her services or that she had in the past received equity or ownership interests in other businesses for her services.

Accordingly, to the extent that *Maglica*'s language implied that a jury can *never* consider the value of an equity or ownership interest in a company in determining the reasonable value of a plaintiff's services in a quantum meruit action, we believe that language should be limited to the specific facts and circumstances in *Maglica*. The " 'holding of a decision is limited by the facts of the case being decided, notwithstanding the use of overly broad language by the court in stating the issue before it or its holding or in its reasoning.' " (*Ace American Ins. Co. v. Fireman's Fund Ins. Co.* (2016) 2 Cal.App.5th 159, 175; see also *PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1097 ["the language of an opinion must be construed with reference to the facts presented by the case; the positive authority of a decision is coextensive only with such facts"].)

Second, we disagree with *Maglica* to the extent its language may be read to suggest a universal rule that the reasonable value of a plaintiff's services in a quantum meruit action can *never* be determined by the value of an equity or ownership interest in a defendant. For quantum meruit purposes, reasonable value is the price that a willing buyer would pay to a willing seller, neither being under compulsion to buy or sell, and both having full knowledge of all pertinent facts. (*Children's Hospital Central California v. Blue Cross of California* (2014) 226 Cal.App.4th 1260, 1274.) In many, if not most, cases, such as in *Maglica*, the evidence of that reasonable value will

70

likely consist of evidence showing that a plaintiff historically received an hourly wage or salary for his or her services and/or that other sellers of comparable services receive certain hourly wages or salaries for such services from buyers of their services. But there may be other cases where the evidence shows that the services provided to a defendant were extraordinary in that the plaintiff provided highly specialized and/or sought-after services for which, in the relevant market, sellers were willing to pay extraordinary compensation other than hourly wages or salaries. (Cf. *Watson, supra,* 209 Cal.App.3d at pp. 1363-1364 [sales commissions]; *Cazares, supra,* 208 Cal.App.3d at pp. 286-287 [attorney contingency fee agreements].) In some markets, a hypothetical buyer may be willing to pay for such extraordinary services by giving the seller an equity or ownership interest in the buyer's company, consistent with past practice or the general custom in the industry. In those unique circumstances, we see no reason why the measure of recovery in quantum meruit should not take into account what a hypothetical buyer would actually pay for the services in the real world. Accordingly, to the extent *Maglica* can be read to set forth a universal rule that the reasonable value of a plaintiff's services in a quantum meruit action can *never* be determined by the value of an equity or ownership interest in a defendant, we disagree.

2. *Value of Impact stock options.* As discussed above, there was ample evidence admitted at trial showing that Brewer had received stock options from other companies for his consulting services. There was also evidence showing that in June 2017 Brewer and Hood discussed granting Brewer Impact stock options for his future consulting services. We conclude that evidence was relevant to the jury's determination of the reasonable value of Brewer's consulting services. On this record, a jury could reasonably have

71

concluded that a willing buyer in the Defendants' position would have paid a willing seller in Brewer's position an equity or ownership interest in Impact for Brewer's expertise and assistance in getting the FDA's hold lifted. Therefore, the trial court erred by expressly instructing the jury that it could not consider the value of an equity or ownership interest in Impact in determining the reasonable value of Brewer's services.

Brewer presented evidence showing that he was an exceptional neurologist with such unique credentials and reputation that he was able to request, and receive, from willing buyers extraordinary compensation (i.e., stock options) for his consulting services. In particular, Brewer presented evidence showing that other companies had offered him, and he had received, stock options for his consulting services. He also testified that in 2017 he was no longer accepting offers to perform consulting services for companies unless they granted him stock options for his services. Therefore, in the facts and circumstances of this case, there was evidence to support a special instruction that in determining the reasonable value of Brewer's consulting services, the jury *could* consider the value of an equity or ownership interest that a hypothetical willing buyer would pay to a hypothetical willing seller of those services. In any event, the jury should *not* have been instructed that it *could not* consider the value of an equity or ownership interest in a hypothetical willing buyer. The question of whether to value Brewer's consulting services based simply on an hourly wage, as Defendants argued, or on the value of stock options that he likely would have received from Impact in the marketplace for his services, as Brewer argued, should have been a question for the jury, and not the court, to decide based on the evidence presented. Accordingly, we conclude the trial court erred by instructing the jury on

72

quantum meruit damages that it could not consider "the value of an equity or ownership interest in any party."

3. *Value of benefit to Defendants.* Brewer also argues that the trial court erred in instructing on quantum meruit damages that the jury could not consider the value of any *benefit* that Defendants received from his consulting services. In support of his argument, Brewer cites only *Watson, supra*, 209 Cal.App.3d 1359. In *Watson*, the defendant agreed to pay the plaintiff a 3 percent commission for sales that the plaintiff obtained from a large potential customer. (*Id.* at p. 1361.) The plaintiff obtained that customer's business for the defendant and received a 3 percent sales commission until the defendant summarily terminated him. (*Id.* at pp. 1361-1362.) The customer continued to place orders with the defendant thereafter, but the defendant did not pay the plaintiff any sales commission for those post-termination orders. (*Id.* at p. 1362.) The plaintiff filed an action against the defendant, alleging, among other things, a quantum meruit cause of action. (*Ibid.*) After a bench trial, the trial court found the defendant liable on the plaintiff's quantum meruit claim and awarded him the value of the sales commissions that he would have received from the defendant for orders placed by that large customer (i.e., 3 percent) during a seven-month period after the plaintiff's termination. (*Id.* at p. 1364.)

On appeal, *Watson* concluded that the trial court did not err in awarding the plaintiff quantum meruit damages based on its consideration of the defendant's previous agreement to pay the plaintiff a 3 percent sales commission. (*Watson, supra*, 209 Cal.App.3d at pp. 1365-1366.) *Watson* stated: "[U]se of the commission totals calculated at 3 percent was not an impermissible use of a contract term for quantum meruit recovery. The court may consider the price agreed upon by the parties 'as a criterion in

73

ascertaining the reasonable value of services performed.' [Citation.] [¶] Moreover, the *amount* of the damages *relates* to the 3 percent commission agreed upon, but only in the context of what the reasonable value of [the plaintiff's] services was to [the defendant] for procuring the [large customer] relationship. The reasonable value of those services was not a daily dollar amount for taking [the large customer] golfing—it was the value of the benefit received by [the defendant]. 'California law allows evidence of the value of a benefit conferred to prove reasonable value. [Citation.]' (*LuMetta v. U.S. Robotics, Inc.* [(9th Cir. 1987)] 824 F.2d 768, 770.)" (*Watson*, at p. 1365, fn. omitted.) *Watson* noted that there was voluminous evidence of the benefit that the defendant received from the plaintiff's services that resulted in about one-half of the defendant's production after the plaintiff's termination. (*Id.* at pp. 1365-1366.) Therefore, the court concluded that substantial evidence supported the trial court's award of quantum meruit damages to the plaintiff. (*Ibid.*)

Although we do not doubt that *Watson* correctly concluded that substantial evidence supported the quantum meruit damages awarded by the trial court in the circumstances of that case, we disagree with its reliance on *LuMetta v. U.S. Robotics, Inc.* (9th Cir. 1987) 824 F.2d 768 (*LuMetta*) as support for its statement that in determining the reasonable value of services in a quantum meruit action, the trier of fact may consider the value of the *benefit* received by the defendant from the plaintiff's services. (*Watson, supra*, 209 Cal.App.3d at p. 1365.) Based on our review of *LuMetta*, we believe that the Ninth Circuit Court of Appeals did not correctly interpret California law. In the context of a breach of implied contract action, *LuMetta* stated: "California law allows evidence of the value of a benefit conferred to prove reasonable value. See, e.g., *Ferrier v. Commercial Steel Corp.* [(1956)]

74

142 Cal.App.2d 424, 426-[427]." (*LuMetta*, at p. 770.)  First, we note that *LuMetta* involved a breach of implied contract action and *not* a quantum meruit claim.  Second, and more importantly, the only case cited by *LuMetta* in support of its statement was *Ferrier v. Commercial Steel Corp.* (1956) 142 Cal.App.2d 424 (*Ferrier*).

Our review of *Ferrier* does not support *LuMetta*'s statement regarding California law.  In *Ferrier*, in deciding a breach of contract claim, the trial court considered evidence of the terms of the parties' written contract for regular laundry services and the testimony of another laundry operator regarding the amount he believed should be added to the written contract for the extra work (i.e., removing ink from and ironing cotton bags) performed by the plaintiff for which the defendant had agreed to pay its reasonable value. (*Ferrier, supra*, 142 Cal.App.2d at pp. 424-425.)  On appeal, *Ferrier* concluded that substantial evidence supported the trial court's finding that the reasonable value of the extra work performed by the plaintiff was $137.90. (*Id.* at pp. 425-428.)  In so concluding, *Ferrier* stated:  "It is well settled that the price agreed upon by the parties for work to be done may be used as a criterion in ascertaining the reasonable value of services performed."  (*Id.* at p. 427.)  In support, *Ferrier* cited a number of cases, including quantum meruit cases, in which the courts set forth the unsurprising proposition that evidence of a contract between the parties may be admissible evidence in determining the reasonable value of services.  (*Ibid.*)

Contrary to *LuMetta*'s apparent reading of that case, *Ferrier* did *not* expressly or implicitly state that, much less even address the question of whether, evidence of the value of a benefit conferred was admissible to prove the reasonable value of services in a quantum meruit action.  (*LuMetta, supra*, 824 F.2d at p. 770.)  Because *Ferrier* does not support *LuMetta*'s

75

assertion that California law allows evidence of the value of a benefit conferred to prove reasonable value and *Watson*, in turn, relied solely on *LuMetta* for that proposition, we conclude that *Watson* cannot be viewed as good authority for Brewer's assertion that in determining quantum meruit damages a jury may consider the value of the benefit received by the defendant from the plaintiff's services.  Furthermore, our independent review of case law has not found any other case that supports such a proposition.  On the contrary, *Maglica* discussed that issue and concluded that "[t]he legal test for recovery in quantum meruit is not the value of the benefit [to the defendant of the plaintiff's services], but value of the services (assuming, of course, that the services were beneficial to the [defendant] in the first place)." (*Maglica, supra*, 66 Cal.App.4th at p. 446.)  Because *Watson* does *not* support Brewer's assertion, we conclude that the trial court did not err, as he argues, in instructing the jury that in determining the reasonable value of his services on his quantum meruit claim, it could not consider "the value of any resulting benefit those services may have conferred on the recipient."

C

*No prejudice*.  Given our conclusion above that the trial court erred in precluding the jury from considering the value of an equity or ownership interest in Impact (but did not err in precluding it from considering the value of any benefit Defendants received from Brewer's consulting services), we must now address whether, as Brewer argues, that instructional error was prejudicial and requires a new trial on quantum meruit damages.  After briefing, we issued an order requesting that the parties submit supplemental briefs on this question of prejudice.  In particular, we requested that the parties "address the question of whether it is reasonably probable that the jury, if it had not been instructed it could not consider the value of an equity

76

or ownership interest in any party, would have awarded [Brewer] quantum meruit damages that would not have been duplicative of the damages that it awarded for fraudulent concealment." We have received, and considered, the supplemental briefs submitted by the parties in response to our order.

As referenced in our order, there is an established doctrine under California law that precludes awards of duplicate damages. In *Tavaglione v. Billings* (1993) 4 Cal.4th 1150 (*Tavaglione*), the court stated: "Regardless of the nature or number of legal theories advanced by the plaintiff, he is not entitled to more than a single recovery for each distinct item of compensable damage supported by the evidence. [Citation.] Double or duplicate recovery for the same items of damage amounts to overcompensation and is therefore prohibited. [Citation.]" (*Id.* at pp. 1158-1159.) "In contrast, where separate items of compensable damage are shown by distinct and independent evidence, the plaintiff is entitled to recover the entire amount of his damages, whether that amount is expressed by the jury in a single verdict or multiple verdicts referring to different claims or legal theories." (*Id.* at p. 1159; cf. *DuBarry Internat., Inc. v. Southwest Forest Industries, Inc.* (1991) 231 Cal.App.3d 552, 563-564 (*DuBarry*) [duplicate damages doctrine applied because although plaintiff alleged both breach of contract and tort claims, it offered no evidence of damages for each claim other than same lost commissions]; see also, *Walker v. Signal Companies, Inc.* (1978) 84 Cal.App.3d 982, 995 (*Walker*) [same damages cannot be awarded on different theories of recovery].) In *Slater v. Blackwood* (1975) 15 Cal.3d 791 (*Slater*), the court stated: "Even where there are multiple legal theories upon which recovery might be predicated, one injury gives rise to only one claim for relief." (*Id.* at p. 795.) Likewise, *Sanchez v. Martinez* (2020) 54 Cal.App.5th 535 (*Sanchez*) precluded recovery of duplicate damages for the same harm

(i.e., failure to pay for employee's authorized rest periods) under different theories of recovery. (*Id.* at pp. 546-547.)

Here, Brewer argues that the trial court's instructional error was prejudicial because it is reasonably probable that a correct instruction on quantum meruit damages would have resulted in a more favorable award to him of quantum meruit damages, which would not have been duplicative of the $1 million award of compensatory damages for fraudulent concealment. In particular, he argues that because his fraudulent concealment and quantum meruit causes of action protected different interests, the jury would necessarily conduct different damages analyses. However, he does not cite any specific evidence showing that his financial harm from each legal theory of recovery differed and likely would have resulted in different awards of damages if the jury had been correctly instructed on quantum meruit damages.

Defendants argue that the court's instructional error was not prejudicial because the evidence of Brewer's damages showed the same harm for both legal theories of recovery. Therefore, they argue it is not reasonably probable that the jury, if correctly instructed, would have awarded Brewer additional quantum meruit damages that were not duplicative of its award of damages for fraudulent concealment. They note that Brewer's evidence of damages for both causes of action showed only the same loss of the value of hypothetical stock options that he would have received from Impact for his consulting services. Because Brewer did not, and could not, present "distinct and independent evidence" showing two separate harms, he could not recover the lost value of those hypothetical stock options twice. (*Tavaglione, supra*, 4 Cal.4th at p. 1159.)

78

We agree with Defendants and conclude that the trial court's instructional error in precluding the jury from considering the value of an equity or ownership interest in Impact was *not prejudicial* to Brewer. Brewer did not present at trial, and does not cite on appeal, any specific evidence showing he suffered any harm other than the loss of the value of Impact stock options that he would have, or should have, received for his consulting services. Therefore, under both his fraudulent concealment and quantum meruit causes of action, he sought recovery of damages for the same harm. Absent "distinct and independent evidence" showing two separate harms, we conclude that Brewer could not recover the lost value of those hypothetical stock options twice under both his fraudulent concealment and quantum meruit causes of action. (*Tavaglione, supra*, 4 Cal.4th at p. 1159.) Therefore, any additional award of quantum meruit damages based on a correct instruction and the same evidence of Brewer's harm would necessarily violate the doctrine against duplicate damages. (*Id.* at p. 1158 ["Regardless of the nature or number of legal theories advanced by [Brewer], he is not entitled to more than a single recovery for each distinct item of compensable damage supported by the evidence."]; see also, *Slater, supra*, 15 Cal.3d at p. 795; *Sanchez, supra*, 54 Cal.App.5th at pp. 546-547; *DuBarry, supra*, 231 Cal.App.3d at pp. 563-564; *Walker, supra*, 84 Cal.App.3d at p. 995.)

In sum, the trial court's error in instructing on quantum meruit damages was not prejudicial because it is not reasonably probable the jury, if correctly instructed as discussed above, would have awarded Brewer any additional quantum meruit damages that were not duplicative of the compensatory damages that it awarded to him on his fraudulent concealment cause of action. Furthermore, we conclude that the jury, given the evidence and instruction with CACI No. 3934, presumably would have found Brewer's

79

damages on those two legal theories of recovery were for the same harm and thus duplicative.[18]

DISPOSITION

The revised judgment is reversed, the order granting partial JNOV as to the amounts of compensatory and punitive damages is reversed, the order denying JNOV as to liability is affirmed, and the original judgment based on the jury's verdict is reinstated.  The original judgment and order denying a new trial are affirmed.  Brewer is entitled to recover his costs on appeal.

BUCHANAN, J.

I CONCUR:

DO, J.

---

[18]     The court instructed the jury with CACI No. 3934 on damages on multiple legal theories, as follows:  "[Brewer] seeks damages from [Defendants] under more than one legal theory.  However, each item of damages may be awarded only once, regardless of the number of legal theories alleged. [¶] You will be asked to decide whether [Defendants] are liable to [Brewer] under the following legal theories: [¶] 1. Quantum Meruit; and [¶] 2. Fraud. [¶] The following items of damages are recoverable only once under all of the above legal theories: [¶] 1. the reasonable value of services provided; or [¶] 2. Damages due to fraud."  Defendants have not challenged the jury's $20,000 quantum meruit award on appeal, so we express no view on whether it was duplicative of the fraud damages.

80

O'Rourke, Acting P. J.,

Concurring in the result in part, dissenting in part.


On the issue of quantum meruit, I concur in the result of the majority's opinion.  But as to the jury's fraud verdict, I respectfully dissent.  In this case, James Brewer—a sophisticated practicing neurologist, Alzheimer's researcher and university professor, and sometime consultant on FDA matters—was asked by Impact Biomedicines (Impact) and its principal, John Hood, for input to assist Impact's efforts in overcoming a hurdle with the FDA.  He did so, and declined to accept compensation:  "I didn't want to tie it with my provision of the summaries (to avoid the appearance of bias toward a particular outcome), but for future consulting, if it is needed, let me know if there is an 'option' for non-employee stock options."  In response, Hood said:  "Definitely Jim.  There will be a scientific advisory role that will come up for which that will be appropriate."  While after this exchange Brewer said he believed he and Impact/Hood had an agreement, and did a few hours of further work for Impact, he conceded at trial that he did not think stock options were a "guaranteed thing."  He also never followed up on any purported option he believed he had been given, but after Impact's sale congratulated Hood, asking only if an advisory role "remain[ed] in the cards . . . ."  Hood responded not by mentioning Impact, but his idea for a different company.  At trial, Brewer testified he had entered into consulting contracts with different companies for stock options, which he described as "an opportunity to buy stock in the company at a given price, the exercise price . . . ."  As the majority summarize, an expert for Impact testified about the value of stock options on two different dates based on the exercise price—

the fair market value of the stock at the time of the grant— "tak[ing at] face value" Brewer's expectation was that Impact would have granted him the typical amount of stock options that he received from other companies.[1]

The jury rejected Brewer's theory that Hood made a false promise to give him stock options in Impact. Instead, the jurors found Impact and Hood fraudulently concealed certain information from Brewer, causing him $1,000,000 in compensatory damages.[2] The majority correctly observes that the law requires us to accept Brewer's testimony that Hood did not disclose that his work would be presented to the FDA, or the fact of Impact's imminent sale. (*Sweatman v. Department of Veterans Affairs* (2001) 25

---

[1] Various of Brewer's option agreements with different companies were entered into evidence. But only one of them involved the type of option that Brewer requested from Impact: a non-employee stock option. Impact's expert observed that at least one of Brewer's prior option grants had specified terms such as the number of shares, the vesting period, termination date, price and exercise price. One of the option grants did not include terms granting Brewer a percentage of the company.

[2] The jury separately awarded Brewer $20,000 in quantum meruit damages, the measure of which is the reasonable value of his services rendered to Impact. (*Maglica v. Maglica* (1998) 66 Cal.App.4th 442, 449 (*Maglica*); *Chodos v. Borman* (2014) 227 Cal.App.4th 76, 96.) Quantum meruit law "looks to the 'reasonable value of [the] services' in the 'open market' . . . ." (*Long Beach Memorial Medical Center v. Kaiser Foundation Health Plan, Inc.* (2021) 71 Cal.App.5th 323, 345, quoting *Maglica*, at p. 450.) Thus, the jury specifically determined Brewer's hours of input were worth $20,000. The majority concludes the jury should have been instructed that they could consider the value of an equity or ownership interest in any party, based "on the value of stock options that [Brewer] likely would have received from Impact in the marketplace for his services." (Maj. opn., *ante*, at p. 73.) I necessarily would conclude that the jury's damages verdict, to the extent it could have been given on a theory of quantum meruit, is likewise invalid as based on speculation and conjecture.

Cal.4th 62, 68 [review standard for a motion for judgment notwithstanding the verdict requires evidence be viewed in the light most favorable to the party securing the verdict]; Maj. opn., *ante*, at pp. 14-15.) Reviewing courts must indulge every legitimate inference that supports the verdict. (*Begnal v. Canfield & Associates, Inc.* (2000) 78 Cal.App.4th 66, 72.)

But I cannot agree with the majority's conclusion that substantial evidence in this record supports the $1,000,000 fraud damages award. "Under California law, a defrauded party is ordinarily limited to recovering out-of-pocket damages. [Citation.] The out-of-pocket measure of damages ' "is directed to restoring the plaintiff to the financial position enjoyed by him prior to the fraudulent transaction, and thus awards the difference in actual value at the time of the transaction between what the plaintiff gave and what he received." ' " (*Fladeboe v. American Isuzu Motors Inc.* (2007) 150 Cal.App.4th 42, 66, quoting *Alliance Mortgage Co. v. Rothwell* (1995) 10

Cal.4th 1226, 1240.)[3] Further, to recover for fraud the "plaintiff must prove loss proximately caused by the defendant's tortious conduct. [Citation.] 'Deception without resulting loss is not actionable fraud.'" (*Fladeboe*, at p. 64, citing in part Civ. Code, § 1709 ["One who willfully deceives another with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers"].) " '[T]he plaintiff has the burden of proving, with reasonable certainty, the damages actually sustained by him as a result of the defendant's wrongful act, and the extent of such damages must be proved as a fact.'" (*Yaffee v. Skeen* (2024) 106 Cal.App.5th 1281, 1316; see also *Coziahr v. Otay Water Dist.* (2024) 103 Cal.App.5th 785, 820.)

The majority point to inferences that the jury assertedly could have drawn from the evidence, including that if Brewer had known about the use and mischaracterization of his work in submissions to the FDA, he "would

---

3    In *Alliance Mortgage* the California Supreme Court compared the benefit of the bargain measure of fraud damages with the out-of-pocket measure, explaining: " 'The "benefit-of-the-bargain" measure . . . is concerned with satisfying the expectancy interest of the defrauded plaintiff by putting him in the position he would have enjoyed if the false representation relied upon had been true; it awards the difference in value between what the plaintiff actually received and what he was fraudulently led to believe he would receive.' [Citations.] 'In California, a defrauded party is ordinarily limited to recovering his "out-of-pocket" loss . . . .'" (*Alliance Mortgage Co. v. Rothwell*, *supra*, 10 Cal.4th at p. 1240.) When a victim is defrauded by fiduciaries, a broader measure of damages provided by Civil Code sections 1709 and 3333 applies. (*Alliance*, at p. 1241; *Fragale v. Faulkner* (2003) 110 Cal.App.4th 229, 236 ["[Civil Code s]ection 3333 is the general tort damage measure, permitting compensation 'for all the detriment proximately caused' by the breach of an obligation not arising from contract"].) Because the jury found no false promise, the benefit of the bargain measure does not apply. Further, there is no fiduciary relationship, so Brewer was limited to proving an "out-of-pocket" loss proximately caused by Hood's concealments. But the $1,000,000 award, which tracks the expert's stock option valuation testimony—appears to give Brewer the benefit of a bargain the jury found he and Hood did not make.

have required Impact to provide him with a consulting agreement, including a grant of stock options for Impact stock" and that Impact "would have offered him" such an agreement.[4] (Maj. opn., *ante*, at pp. 24, 26.) According to the majority, this supports the jury's $1,000,000 fraud damages award.

In my view, even accepting all of the facts favorable to him, Brewer's mere expectation that he and Impact would enter into an agreement for stock option compensation—entirely unspecific as to necessary terms such as vesting or strike price and without evidence Impact's board would have approved them—makes the jury's damages award speculative, uncertain and hypothetical as a matter of law. " 'Whatever the proper measure of damages may be, in a given case, the recovery therefore is still subject to the fundamental rule that damages which are speculative, remote, imaginary, contingent, or merely possible cannot serve as a legal basis for recovery' " (*Lueter v. State of California* (2002) 94 Cal.App.4th 1285, 1302; see also *Buttram v. Owens-Corning Fiberglas Corp.* (1997) 16 Cal.4th 520, 531, fn. 4 ["to be actionable, harm must constitute something more than " '. . . speculative harm, or the threat of future harm—not yet realized . . . . .' "]; *Moore v. Teed* (2020) 48 Cal.App.5th 280, 292.) " '[R]ecovery is allowed if claimed benefits are reasonably certain to have been realized but for the wrongful act of the opposing party.' " (*Moore v. Teed*, at p. 292; accord, *Greenwich S.F., LLC v. Wong* (2010) 190 Cal.App.4th 739, 758, 760 [lost profits as consequence of breach of a property purchase and sale agreement were not "proven with the requisite *reasonable certainty*," i.e., " 'proven to be more than speculative, remote, or contingent' "].) Under the majority's

---

[4]   It is noteworthy that in closing argument, Brewer's attorney told the jury that Impact and Hood had concealed from Brewer that the company had adopted a policy of not giving stock options to any doctors consulting on FDA matters because it would "destroy their credibility" with the FDA.

5

theories supporting a finding of fraudulent concealment, this record is absent substantial evidence of resulting, nonspeculative, damages.

*Brewer Proved No Damages for the Consequence of Hood's Failure to Disclose the Use of His Work to the FDA*

At trial, Brewer presented evidence on an unalleged theory[5] that Hood fraudulently concealed that his input would be given to the FDA. Brewer testified that with respect to his work on a company's behalf for the FDA, his reputation was "really, really, valuable to me" and if he is not permitted to review the FDA submission, it's "very risky to me." However, Brewer did not present evidence, and the majority points to none, that to a reasonable certainty his reputation was negatively impacted by these omissions. The sole inference that can be drawn is that Hood's use and mischaracterization of Brewer's input *could have* hurt Brewer's reputation in the relevant community. But a mere possibility is not enough. (*Williams v. Wraxall* (1995) 33 Cal.App.4th 120, 133 ["A plaintiff cannot recover damages based upon . . . a mere possibility that the wrongful conduct of the defendant caused . . . harm"].) Even assuming the FDA submission somehow hurt Brewer's reputation, nothing in the record places any *value* of that asserted reputational harm under this theory.

---

[5]     The first amended complaint alleges only that Hood told Brewer he would be given stock options for his work and instructed Impact's president to work with lawyers to make that transfer, but later learned, and failed to disclose to Brewer, that it would be impossible for Impact to deliver those options to him without investors' permission.

*The Fraudulent Concealment Theory is Necessarily Premised on a False Promise the Jury Found was Not Made*

The majority say the jury could reasonably infer that had Hood disclosed how Impact used Brewer's input in FDA submissions, Brewer would have required Impact to provide him with a consulting agreement including a grant of stock options. According to the majority, Brewer was harmed because while he *"believed he had been promised stock options in July 2017*, Impact never offered him a stock option agreement." They point out Impact/Celgene's patent attorney testified consulting agreements are "almost universal . . . ." (Maj. opn., *ante*, at p. 25, italics added.)

But the jury rejected the theory that Hood/Impact falsely promised Brewer he would be issued stock options or that he would be offered a consulting agreement with any such options. The theory of damages from concealment, as the majority describes it, is necessarily dependent on such a promise. Hood cannot defraud Brewer by concealing the fact Impact was not giving him a consulting agreement or stock options unless Hood and Impact had promised them to Brewer in the first place. Because Brewer's damages theory is premised on the existence of a promise that the jury found was not made, the award cannot stand.

*The Fraud Damages are Based on the Value of a Purported Option Agreement that the Parties Never Negotiated and Lacks Necessary Terms*

The jury's compensatory award is based on an assumed value of stock options the terms of which were never negotiated, and, as stated, the jury found Hood and Impact never promised. "[S]tock options merely grant the holder a contractual right to buy shares of stock at a later date at an agreed upon exercise price. Whether and when the holder chooses to exercise these options and what the market value of the stock will be at some future date at

7

the time the holder chooses to exercise the options are unknown and undeterminable at the time of the grant." (*Shah v. Skillz Inc.* (2024) 101 Cal.App.5th 285, 315.) Brewer agreed at trial that an option grant was merely an opportunity to buy stock at the exercise price. Impact's expert testified with respect to stock options that parties must negotiate and agree to written terms, including the exercise price and vesting, and, importantly, obtain company approval for the options grant. Specifically, here, Impact's board was required to approve the issuance of the options and they would be priced after approval; Hood could not have issued the options himself. The expert testified without contradiction that there were no communications or negotiations between the parties about exercise price or vesting terms.

Brewer's unilateral expectation that Impact would have offered him a stock option agreement is just that: an expectation. It does not permit an inference that he and Hood would have negotiated or come to the terms necessary for such an agreement, or that the board would have approved the options. Inferences must be *legitimate*, they " 'must rest on the evidence' [citation]; inferences that are the result of mere speculation or conjecture cannot support a finding [citations]." (*Kuhn v. Department of General Services* (1994) 22 Cal.App.4th 1627, 1633; *Harley-Davidson, Inc. v. Franchise Tax Bd.* (2015) 237 Cal.App.4th 193, 213.) " 'The ultimate test is whether it is reasonable for a trier of fact to make the ruling in question in light of the whole record.' " (*Harley-Davidson*, at pp. 213-214.) On this record, the jury's fraud award is inherently speculative and contingent.

The expert's testimony recited above concerning the valuation of Brewer's desired option did not fill in the necessary blanks; he confirmed that he merely assumed (took at "face value") the truth of Brewer's testimony

8

about the grants he typically obtained.[6]  Further, that Brewer had entered into various stock-related contracts with other companies does not permit a legitimate inference—i.e.. one not based on speculation, conjecture or possibilities—that Impact would have granted him his requested non-employee stock option for his contributions.  The record is absent substantial evidence showing, to a reasonable certainty, Brewer suffered damage of $1,000,000 in stock options.

*The Majority's Analysis Upholding the Fraud Verdict is Indistinguishable From a Quantum Meruit Analysis, Which Fails Under* Maglica

The majority uphold the jury's fraud damages verdict by pointing to testimony that Brewer expected his consulting services to Impact deserved a one to two percent ownership interest in Impact, similar to what other companies had provided to him.  The majority reach this conclusion even in the face of the jury's finding that defendants made no promise about a consulting contract or stock option grant.  In my view, the reasoning is in substance and effect a quantum meruit analysis, where it is irrelevant whether an agreement was made, or promised or enforceable.  (*Maglica, supra,* 66 Cal.App.4th at p. 449 ["recovery in quantum meruit does not require a contract"].)  In quantum meruit, the measure of recovery is the reasonable or fair market value of a party's services, based on a " 'hypothetical transaction.' " (*Long Beach Memorial Medical Center v. Kaiser Foundation Health Plan, Inc.* (2021) 71 Cal.App.5th 323, 345.)

On this record, the majority hold that the jury should have been instructed for purposes of quantum meruit that it could have considered the

---

[6]    In fact, having reviewed Brewer's past option agreements, the expert testified they did not grant percentage interests in the companies.  He also did not find that Brewer's typical award was $30,000 to $40,000; rather, they averaged about $20,800.

value of an equity or ownership interest in Impact in deciding the reasonable value of Brewer's services.  (Maj. opn., *ante*, at pp. 71-73.)  But the reasoning does not follow under *Maglica, supra,* 66 Cal.App.4th 442.  Even if I agree with the majority's conclusions concerning that case, this record does not support such a measure of damages in quantum meruit.

*Maglica* is a case where, as here, the jury found the parties (unmarried cohabitants) factually had no contract: the defendant "never agreed to give [the plaintiff] a share of his business."  (*Maglica*, *supra*, 66 Cal.App.4th at p. 447.)  Yet the jury awarded the plaintiff $84 million because of the tremendous growth of the defendant's business, where she worked.  *Maglica* found this to be error:  "People who work for businesses for a period of years and then walk away with $84 million do so because they have acquired some *equity* in the business, not because $84 million is the going rate for the services of even the most workaholic manager.  In substance, the court was allowing the jury to value the plaintiff's services as if she had made a sweetheart stock option deal—yet such a deal was precisely what the jury found she did not make.  So the $84 million judgment cannot stand."  (*Id.* at p. 446.)  In finding a jury instruction permitted the jury to base quantum meruit damages on the value of services depending on their impact on a business rather than their reasonable value, *Maglica* explained:  "Equity-for-service compensation packages are extraordinary in the labor market, and always the result of specific bargaining.  To impose such a measure of recovery would make a deal for the parties that they did not make themselves.  If courts cannot use quantum meruit to change the terms of a contract which the parties did make [citation], it follows that neither can they use quantum meruit to impose a highly generous and extraordinary contract that the parties did not make."  (*Id*. at p. 451.)

10

The majority say that *Maglica, supra,* 66 Cal.App.4th 442 should not state a universal rule, and that in some circumstances an equity or ownership interest may determine the value of services in quantum meruit. Even if that were so, this is not such a case because Brewer never had an equity interest and any conclusion that he would have obtained one is mere speculation. The majority point to evidence that Brewer had entered into stock option agreements with other companies, but the details about the type or nature of the services Brewer had provided for them does not substantiate how those agreements reflect the reasonable value of his services to Impact, as opposed to the benefit Impact received from his services.[7] While the patent attorney testified that it was almost universal that consultants would have a consulting agreement, she did not testify that such agreements would contain stock options. In my view, the evidence is too vague, uncertain and remote to allow the jury for purposes of quantum meruit to award Brewer an equity or ownership interest in Impact as the reasonable value of his several hours of time doing neurology assessments of patient case files, sitting in on a

---

[7]    Brewer testified that as to the companies with which he had entered into stock option arrangements: "Some of them were imaging consulting work, but using my expertise for their—and probably, mostly reputation for their—for helping them get launched." As to one of the companies, he testified his work was "[p]rimarily presenting to venture capital or individuals seeking to gain start-up funding for this company." For another company, he testified they "asked me to assist" and he "len[t his] expertise" with respect to an Alzheimer's project. Broadly, Brewer testified that his advisory work for these companies was given because "primarily, they wanted to pitch that they have a heavy hitter on board or on the group as an advisor. They want to be able to show potential investors that they . . . have . . . accomplished scientists and . . . doctors on board that . . . buy into the concept." The majority agree that a jury on a quantum meruit claim may be told that they are not permitted to consider the value of any resulting benefit conferred on Impact from Brewer's consulting services. (Maj. opn., *ante*, at p. 76.)

11

conference call, or contributing to a draft abstract.  The trial court should have granted the partial judgment notwithstanding the verdict on the ground that there was no substantial evidence of harm or damage on the fraudulent concealment cause of action.

O'ROURKE, Acting P. J.